Charles Edward FITTS, Jr., Appellant,

v.

The STATE of Texas, Appellee.

Nos. 01–96–00331–CR, 01–96–00332–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 6, 1998.

As Corrected Oct. 5, 1998.

Discretionary Review Refused Feb. 24, 1999.

Dick DeGuerin, Houston, Bennie Ray, Austin, for Appellant.

Travis J. Koehn, Daniel W. Leedy, Cynthia M. Ruiz, Bellville, for Appellee.

Before MIRABAL, WILSON and TAFT, JJ.

## OPINION

TAFT, Justice.

A jury convicted appellant of (1) capital murder by arson, (2) capital murder for remuneration, and (3) arson.[1] The trial court assessed punishment at three life sentences to be served concurrently. We address two issues of first impression in Texas: (1) the proper remedy for error in twice convicting and sentencing appellant for capital murder of the same decedent; and (2) the admissibility of "alerts" made by trained hydrocarbon-sniffing dogs utilized at appellant's home. We also decide (1) whether misspelling "remuneration" rendered the indictment fundamentally defective; and (2) whether the evidence supporting appellant's convictions was legally and factually sufficient to prove that appellant (a) intentionally set the fire, (b) caused his wife to inhale soot until she asphyxiated, and (c) caused his wife's death for remuneration. We affirm the arson judgment, and, as reformed, affirm the capital murder judgment.

## Facts

In 1986, appellant told his friend of 12 years, Merlin Cryer, that if he could ever figure out a way to kill his wife, he would.

In 1989, appellant began an affair with Tracy Munns, the daughter of a wealthy English businessman. Appellant traveled to England with Tracy in 1990 and 1992 and stayed for three-week visits. David Munns, Tracy's father, did not know appellant was married at that time, and discussed appellant's intention to marry Tracy after she graduated from college. After Tracy moved to the Phillipines, appellant continued to call her.

In 1990, appellant obtained a $300,000 life insurance policy on his wife, naming himself as beneficiary. In 1992, appellant asked his insurance agent, without his wife present, to increase the insurance renewal policy on his home. Also, appellant was the beneficiary of his wife's $64,843 in retirement benefits, and a life insurance benefit through her employment, valued at $222,000.

Nine days before the fire, appellant placed an advertisement in the newspaper to sell his Mercedes–Benz vehicle, which read "Must sell. Leaving country."

Around 2:30 a.m. on June 8, 1994, a fire started at appellant's home. Appellant claimed he was asleep on the couch and awoke to find the living room filled with smoke and intense heat. Appellant said he ran outside through the front door and began breaking windows, and then broke in the back door trying to get his wife out.

Kenneth Manus, on his way home from work, noticed smoke coming from appellant's home and stopped to investigate. Manus encountered appellant driving out of the driveway. According to Manus, appellant seemed confused, and asked for his help. Manus asked appellant where the nearest phone was, and told appellant he was going to get help. Upon further questioning by Manus, appellant stated that his wife was still in the house. Manus observed that appellant was smeared with soot, but was not

---

1. Appellant was twice convicted of capital murder in cause number 94R–095, our cause number 01–96–00331–CR. Appellant's arson conviction was in cause number 94R–096, our cause number 01–96–00332–CR.

burned, and that appellant did not act as he would have if his wife were in a burning house. Appellant went to a neighbor's house and asked her to call the fire department, which she did. Appellant then proceeded to another neighbor's house to ask for help.

EMS attendants and other personnel at the scene observed that appellant was not burned and did not suffer from soot inhalation. Appellant was taken to the hospital, and a nurse who saw him that evening stated that appellant had no injuries except for a scratch on the forehead. While appellant's medical records show that he did have burns on his body, the nurse who prepared those records did not testify at trial.

At trial, the State called numerous experts who stated that the fire was intentionally set, and that other possible causes, such as faulty electrical wiring, had been ruled out. Their conclusions were based on a "pour pattern" found in two rooms of the house indicating that gasoline was used as an accelerant, certain "alerts" made by hydrocarbon-sniffing dogs that were called to the scene after the fire, and the results of scientific testing that showed a trace of gasoline in one of the samples collected at the scene. The defense called its own experts who stated that gasoline was not used to start the fire and that the fire was accidental in origin.

### Multiple Capital Murder Convictions/Sentences

■ In his second point of error, appellant contends that the trial court violated the protections against double jeopardy in the United States and Texas constitutions by twice convicting and sentencing him for capital murder arising out of the same criminal episode involving the same decedent. The capital murder indictment alleged alternative theories in two paragraphs: (1) murder for "*renumeration* ";[2] and (2) murder by arson. Appellant was also charged, by separate indictment, with the offense of arson. The trial court's charge submitted both theories of capital murder to the jury without disjunctive language and provided verdict forms allowing the jury to find appellant twice guilty of capital murder, as well as arson. Appellant did not object to the jury charge at trial, nor does he challenge it on appeal. In addition to finding appellant guilty of arson, the jury found appellant guilty of both capital murder by arson and capital murder *for remuneration*. The trial court's judgment reflects that appellant was convicted of "Capital Murder/Arson, Capital Murder/Remuneration and Arson Bodily Injury or Death." The judgment sentenced appellant to three concurrent life sentences.

■ When a statute sets out several ways an offense can be committed, each of which embraces the same definition, is punishable in the same manner, and is not repugnant to any other, the various methods of commission are not distinct offenses, and may be charged in the same indictment. *See Jurek v. State*, 522 S.W.2d 934, 941 (Tex. Crim.App.1975). The State need not elect between the various theories alleged; rather, the jury may consider all theories and return a general verdict of guilty. *See Sperling v. State*, 924 S.W.2d 722, 727 (Tex.App.—Amarillo 1996, pet. ref'd).

In this case, the State concedes that the jury returned two verdicts convicting appellant for what should have been a single charge of capital murder, and that the trial court sentenced appellant under both theories of capital murder instead of rendering a general verdict of guilty. Appellant correctly argues that such dual convictions and punishments for the same offense are barred by constitutional protections against double jeopardy. *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 14. The only disputed issue is the appropriate appellate remedy.

To assist us in fashioning a remedy, both appellant and the State refer us to cases which involved convictions for multiple *offenses*, as opposed to multiple theories for the same offense, charged in the same indictment. *See Ex parte Drake*, 883 S.W.2d 213, 216 (Tex.Crim.App.1994); *Johnson v. State*, 784 S.W.2d 47, 49–50 (Tex.Crim.App.1990).

**2.** Point of error one will address the use of the word "renumeration" instead of "remuneration." In light of our holding that it was an obvious typographical error, we will refer to this theory as "murder for remuneration."

These cases hold that an indictment may not charge more than one *offense,* and that any conviction in excess of one per indictment is void. *See Drake,* 883 S.W.2d at 216; *Johnson,* 784 S.W.2d at 49. In *Drake* and *Johnson,* the court determined the appropriate remedy for multiple offenses improperly charged in the same indictment was to uphold the offense for which the defendant was first convicted, to vacate the remaining convictions, and to reform the judgment accordingly. *See Drake,* 883 S.W.2d at 216; *Johnson,* 784 S.W.2d at 50. By way of analogy to this line of cases, appellant and the State request that we reform the judgment of the court below, albeit in different respects. Appellant contends that, because of the constitutional magnitude of the multiple capital murder convictions, we should vacate and reverse both convictions and reform the judgment accordingly. In the alternative, appellant requests that we vacate and reverse the conviction and sentence for capital murder for remuneration. The State requests that we reform the judgment to show one general verdict that does not distinguish between the theories charged in the indictment.

■ This Court has the power to modify and correct a judgment as the law and nature of the case may require. TEX. R. APP. P. 43.2, 43.6. In this case, it is clear from the record that the jury, by unanimous decision, found appellant guilty of both capital murder by arson and capital murder for remuneration. It is equally clear that the trial judge sentenced appellant to life for each conviction. Based on the clear expressions of the jury and the court, we agree that it is feasible to craft a remedy by analogy to the "multiple offense" cases cited by both parties. However, we decline to adopt either appellant's or the State's suggested approaches. Instead, we choose to follow the lead of the Court of Criminal Appeals, which has adopted the "most serious offense" test to determine which offense to dismiss when multiple offenses are charged in the same indictment. *Ex parte Pena,* 820 S.W.2d 806, 808–10 (Tex.Crim.App.1991) (reforming judgment to reflect conviction for aggravated robbery, and vacating conviction for burglary of a habitation). In *Pena,* the court set forth

its reasons for adopting this test, including: (1) it avoids arbitrary distinctions based on which allegation or conviction preceded the others; (2) it assumes that if the State had been made to elect an offense, the State would have chosen the most serious one; and (3) it is consistent with the objective of the Penal Code to insure the public safety through the deterrent influence of the penalties it provides. *See Pena,* 820 S.W.2d at 809. We see no reason why this test should not or cannot be applied by analogy to judgments containing improper convictions based on alternative theories.

We must now decide which of appellant's capital murder convictions is the "most serious," and reform the judgment accordingly. In point of error three, appellant contends that arson is a lesser included offense of capital murder by arson, and, therefore, his convictions for both offenses constitute a violation of the constitutional protections against double jeopardy. Assuming, but not deciding, that appellant's double jeopardy argument were meritorious, we would be forced to reverse the arson conviction if we followed appellant's suggestion and vacated his conviction for capital murder for remuneration, leaving only his convictions for arson and capital murder by arson. However, if we were to vacate appellant's conviction for capital murder by arson, the double jeopardy issue in point of error three is avoided, and appellant can be convicted of both capital murder and arson.

■ Based on the Court of Criminal Appeals' reasoning for adopting the "most serious offense" test, we will vacate appellant's conviction for capital murder by arson, and reform the judgment accordingly. We believe that, given the state of the verdict, the State would have, if forced to make an election, chosen to uphold the conviction for capital murder by remuneration, avoiding the double jeopardy question arising from appellant's additional conviction for arson. *See Pena,* 820 S.W.2d at 809. In addition, it is our opinion that avoiding the double jeopardy issue, thereby preserving two of appellant's three convictions, is most consistent with the objective of the Penal Code, namely, insuring

the public safety through the deterrent influence of the penalties it provides. *See id.*

Because the trial court assessed a separate sentence for each offense, we need not remand the case to the trial court for a reassessment of punishment. Instead, we vacate that portion of the judgment showing a conviction for capital murder by arson and reform the judgment to reflect convictions for capital murder by remuneration and for arson, punished by two life sentences, each to run concurrently. *See id.* at 810.

We sustain appellant's second point of error in part.

### Admissibility of Hydrocarbon–Sniffing Dog Alerts

■ In his tenth point of error, appellant asserts that the trial court erred in allowing George Cavitt to testify that his hydrocarbon-sniffing dogs "alerted" to several areas in and about appellant's home. Cavitt and his dogs were called to the scene to identify areas of the home that might contain evidence of an accelerant. After the dogs alerted to several different areas, samples were collected and sent to a laboratory for testing. One of these samples came back positive for gasoline. Prior to trial, appellant filed a motion to suppress any evidence of the "alerts" made by the dogs, and a hearing on the motion was held outside the presence of the jury. After hearing testimony from Cavitt and others concerning his training techniques and experience, the trial court denied the motion.

Several Texas decisions address the use of (1) "tracking dogs," and (2) drug-sniffing dogs utilized for determining probable cause.

*See Parker v. State,* 46 Tex.Crim. 461, 80 S.W. 1008, 1011 (1904) (recognizing admissibility of tracking-dog evidence); *Walsh v. State,* 743 S.W.2d 687, 689 (Tex.App.—Houston [1st Dist] 1987, no pet.) (addressing the use of drug-sniffing dogs for determining probable cause). However, we have found no Texas case addressing the reliability of evidence derived from dogs trained to "alert" to the presence of hydrocarbons.[3] In reviewing the trial court's decision to deny appellant's motion to suppress, we will apply an abuse of discretion standard. *Kelly v. State,* 824 S.W.2d 568, 574 (Tex.Crim.App.1992). The trial court is the sole judge of the weight and credibility of the evidence presented at the suppression hearing. *Id.* We will reverse only if the trial court's decision falls outside the zone of reasonable disagreement. *Id.*

### A. Standard of Admissibility

Rule of Criminal Evidence 702, which governed the admission of expert testimony at trial, provided:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

TEX. R. CRIM. EVID. 702.[4] In *Kelly v. State,* the Court of Criminal Appeals held that rule 702 superseded the "general acceptance" standard for the admissibility of scientific expert testimony articulated in *Frye v. United States. Kelly,* 824 S.W.2d at 572. The trial court's task in assessing admissibility under rule 702 is to determine whether

3. Other jurisdictions have come to differing conclusions concerning the admissibility of such evidence. Decisions from those jurisdictions usually turn on the standard of admissibility applied to the evidence. In *State v. Buller,* the Iowa Supreme Court held that the State had laid a sufficient foundation to support admission of similar evidence pursuant to Iowa's Rule of Evidence 702, which is identical to Texas Rule of Criminal Evidence 702. 517 N.W.2d 711, 714 (Iowa 1994). In *Carr v. State,* the Georgia Supreme Court found that hydrocarbon-sniffing dog evidence was not admissible because the State failed to meet Georgia's standard requiring that the reliability and accuracy of such evidence be

shown to a "verifiable certainty." 267 Ga. 701, 482 S.E.2d 314, 317–18 (1997). In *People v. Acri,* the Third District Appellate Court of Illinois found that similar evidence did not meet the "general acceptance" standard articulated in *Frye v. United States,* the standard governing the admissibility of scientific evidence in Illinois. 277 Ill.App.3d 1030, 214 Ill.Dec. 761, 662 N.E.2d 115, 117 (1996).

4. The Texas Rules of Civil and Criminal Evidence were consolidated effective March 1, 1998. Former TEX. R. CRIM. EVID. 702 and new TEX. R. EVID. 702 are identical.

the scientific evidence is sufficiently reliable and relevant to help the jury in reaching accurate results. *Kelly*, 824 S.W.2d at 572.

To be considered reliable, evidence based on a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Hartman v. State*, 946 S.W.2d 60, 62 (Tex.Crim.App. 1997); *Kelly*, 824 S.W.2d at 573. Factors affecting a trial court's determination of reliability include: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or reflecting the underlying scientific theory and technique; (4) the technique's potential rate for error; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573. The proponent of the scientific evidence must prove its relevancy by clear and convincing evidence. *Id.* If the trial court is so persuaded, then the evidence should be admitted for the jury's consideration, unless the trial court determines that the probative value of the evidence is outweighed by some factor identified in rule 403. *Id.*

Appellant challenges the trial court's denial of appellant's motion to suppress by claiming that no evidence was presented to satisfy the three criteria outlined in *Kelly*. Appellant does not specifically contest any of the evidence presented at the suppression hearing, relying instead on the bare assertions that no evidence was presented showing that (1) Cavitt's training methods were based on any scientific theory, (2) Cavitt's training technique was validly applied to the dogs in question, and (3) the manner in which Cavitt conducted the search comported with any theory. Viewing the evidence in the light most favorable to the trial court's decision, we will apply the *Kelly* criteria to determine

if the trial court abused its discretion in denying appellant's motion to suppress.

## B. Evidence Presented at Suppression Hearing

Cavitt is currently employed by the Houston Police Department in the Auto Theft/K–9 unit. Cavitt has attended several dog training seminars, some of which have addressed the use of hydrocarbon-sniffing dogs. He has read books and watched videotapes about training dogs to alert to hydrocarbons, and has consulted with and trained under pioneers in the field, including William Tolhurst of the Niagara County Sheriff's department in New York. He has conducted several seminars on the use of hydrocarbon-sniffing dogs for the Houston Fire Academy and the Brenham Volunteer Fire Department. Although Cavitt is aware of only one possible licensing entity for such dogs in California, he stated that hydrocarbon-sniffing dogs are utilized extensively by law enforcement agencies across the country. Such dogs are used in California, Florida, Connecticut, Maine, Texas, Illinois, Indiana, Iowa, and Georgia. Training dogs for hydrocarbon detection began with the Connecticut State Police in the 1980's, and they reported a 90% success rate for hydrocarbon detection.

To search the Fittses' home, Cavitt used two hydrocarbon-sniffing dogs, Samantha and Jager. He has owned both dogs for over four years, and has trained them to detect the presence of hydrocarbons. Both dogs are also trained to detect narcotics, cadavers, and air scents. He considered both dogs reliable enough to conduct investigations when they were two years old. The dogs are given a specific command to search for a particular substance, and he has never seen a situation where the dogs searched for and alerted to a substance different from the one he commanded. Cavitt's dogs do not determine whether a particular fire was caused by arson, but, rather, whether hydrocarbons are present on the scene.

Cavitt produced in court a printed copy of his scent detection theory, along with incident reports detailing each search he has conducted at the request of law enforcement agencies. He created the training methods

himself, relying on the input of other experts in the field. His training method is a variation on other accepted methods for training dogs to detect narcotics or other substances. Samantha and Jager are trained by utilizing gasoline evaporated down to 50% volume, which closely approximates the scent given off by accelerants used to burn buildings. In training, two separate piles of debris are burned. One pile is contaminated with the gasoline, while the other is not. The dogs are then commanded to search for the debris containing the hydrocarbons. This training is reinforced on a daily basis. When the dogs detect the scent of a hydrocarbon, they scratch or whine. Cavitt believes that the dogs scratch within six inches of where the hydrocarbon can be found.

Samantha and Jager have worked approximately 50 fires for different law enforcement agencies, including the Houston Fire Department, the City of Bellville, and agencies in Harris, Fort Bend, and Austin Counties. Cavitt has also been used by State Farm Insurance Company for arson investigations. Cavitt testified that his dogs are correct 99.9% of the time. The dogs alerted at each of the 50 fires at which he assisted law enforcement. For 49 of those fires, it was later determined, either through laboratory testing or by independent verification from witnesses or arson investigators, that an accelerant was used. Although the dogs sometimes give multiple alerts, and samples taken from those areas do not contain hydrocarbons, it does not mean that hydrocarbons are not present. The sample could have been collected a few inches from where the hydrocarbon actually was, or it could have evaporated to the point where laboratory analysis could not detect it. In any event, the dogs have never alerted and been proven incorrect by a later finding that no hydrocarbons were present.

At the suppression hearing, Thomas Wood, an arson investigator with the Houston Fire Department, and Ronnie Ziesmer, an arson investigator with the Harris County Fire Marshall's office, also testified. Wood had used Cavitt and his dogs 30 times in the last three years, and considered them 100% accurate. According to Wood, Cavitt and his dogs had an excellent reputation for accuracy within the arson investigation community. Ziesmer had used Cavitt four times, and the dogs were accurate and enjoyed a reliable reputation. In addition, Cleva West, an employee of the Houston Police Department Crime Lab, ran an experiment with Cavitt to test the reliability of the dogs. The dogs did alert on the "spiked" samples, and not on the clean samples. Finally, according to Bonnie Beaver, a doctor of veterinary medicine at Texas A & M University, humans have only one-tenth the sense of smell that dogs have.

Cavitt followed his normal procedures when searching the Fittses' house. One dog worked on a leash, and the other off. Other investigators stayed back while the dogs were working, and later collected samples at the locations where the dogs alerted. As he usually does, Cavitt cleaned the dogs noses and feet before and after the search.

## C. Application of *Kelly*

A review of the *Kelly* factors shows that Cavitt, an experienced dog trainer, modified existing training techniques to train his dogs in hydrocarbon detection, a field with no generally accepted method of certification. Notwithstanding the lack of a certification process, hydrocarbon-sniffing dogs are utilized around the country in arson investigations. Based on extensive use by various law enforcement agencies, it is clear that Cavitt's training technique and the theory on which it is based are accepted by the arson investigation community. The potential rate of error for these particular dogs is small, in that the dogs have been correct as to the presence of hydrocarbons 49 out of 50 times. Their reliability was further proven in this case, as evidenced by the laboratory tests showing the presence of gasoline at the scene. The testimony of Cleva West showed that other experts had tested and evaluated Cavitt's technique, and found it to be valid. Other individuals from law enforcement agencies testified to the high level of skill and reliability of Cavitt and his dogs. Finally, Cavitt was able to clearly explain his theory and experience to the trial court, and was thoroughly cross-examined by appellant.

Viewing the evidence in the light most favorable to the trial court's decision, we conclude that it was demonstrated by clear and convincing evidence that the training theory utilized by Cavitt was valid, that the methods and technique used to apply that theory were valid, and that his technique was properly applied on the occasion in question. *See Kelly,* 824 S.W.2d at 574. Moreover, there is nothing in the record to suggest that the probative value of the dog-sniffing evidence was outweighed by any of the rule 403 factors favoring inadmissibility. *See* TEX. R. CRIM. EVID. 403.[5] We conclude, therefore, that the trial court's decision to admit the evidence was not an abuse of discretion.

We overrule appellant's tenth point of error.

The discussion of the remaining points of error does not meet the criteria for publication, TEX. R. APP. P. 47.4, and is thus ordered not published.

We affirm the arson judgment, and, having vacated the capital murder by arson portion, we also affirm the capital murder judgment.

### Defective Indictment

■ In his first point of error, appellant claims that paragraph "B" of the indictment is fundamentally defective in that it charges murder for *"renumeration"* instead of for *"remuneration"* and, therefore, fails to state a constituent, aggravating element raising murder to capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a)(3) (Vernon 1994). Paragraph "B" of the indictment provided:

And the grand jurors aforesaid, upon their oaths do further present in and to the court that on or about June 8, 1994, in Austin County, Texas, Charles Fitts, Jr. did, then and there intentionally and knowingly cause the death of an individual, namely, Frances Fitts, by asphyxiation from soot inhalation, and the murder was committed for *renumeration* and the promise of *renumeration,* namely; money from the proceeds of insurance policies with Massachusetts Mutual Life Insurance

Company on Frances Fitts in which the defendant is the named beneficiary, against the peace and dignity of the State.

(Emphasis added).

■ A written instrument is an indictment or information under the Constitution if it accuses someone of a crime with enough clarity and specificity to identify the penal statute under which the State intends to prosecute, even if the instrument is otherwise defective. *Duron v. State,* 956 S.W.2d 547, 550 (Tex.Crim.App.1997). Paragraph "B" of the indictment utilized the term "renumeration" instead of "remuneration," transposing the letters "n" and "m." Following the term "renumeration," the indictment characterized "renumeration" as money from the proceeds of insurance policies for which appellant was the designated beneficiary. *See* TEX. CODE CRIM. P. ANN. art. 21.17 (Vernon 1989) (language of indictment sufficient if other words conveying the same meaning are used). Although the misspelling did amount to a technical defect, it is clear from the face of the document that the intended term was "remuneration," based on the close similarity of the two words and the subsequent description of the insurance policy proceeds. Therefore, we hold that the misspelling of the word "remuneration" did not result in failure to give the necessary notice of the statutory offense with which the defendant was charged.

We overrule appellant's first point of error.

### Double Jeopardy

In his third point of error, appellant contends that the trial court violated the United States and Texas constitutional protections against double jeopardy by convicting and sentencing appellant for both arson and capital murder by arson, because the former is a lesser included offense of the latter. Because we have vacated appellant's conviction for capital murder by arson, we need not consider this point of error. Appellant's third point of error is moot.

---

**5.** The Texas Rules of Civil and Criminal Evidence were consolidated effective March 1, 1998. For-

mer TEX. R. CRIM. EVID. 403 and new TEX. R. EVID. 403 are identical.

## Sufficiency of the Evidence

In points of error four through nine, appellant attacks the legal and factual sufficiency of the evidence supporting his convictions. In light of our disposition of point of error two, we address only points of error six through nine, which concern the sufficiency of the evidence supporting appellant's convictions for arson and for capital murder for remuneration.[6] Specifically, appellant contends the evidence was legally and factually insufficient to prove that (1) the fire was intentionally set and appellant was responsible for setting it, (2) appellant intentionally and knowingly caused his wife to inhale enough soot to asphyxiate her, and (3) appellant caused his wife's death for remuneration.

When reviewing the legal sufficiency of the evidence, a court must examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Daniels v. State*, 853 S.W.2d 749, 750 (Tex.App.—Houston [1st Dist.] 1993, no pet.). This standard of review is the same for both direct and circumstantial evidence. *Simms v. State*, 848 S.W.2d 754, 756 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd). If evidence exists that establishes guilt beyond a reasonable doubt, and the jury believes that evidence, we are not in a position to reverse the judgment on sufficiency of the evidence grounds. *Jenkins v. State*, 870 S.W.2d 626, 628 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd). In reviewing factual sufficiency, we view all the evidence without the prism of "in the light most favorable to the prosecution." *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim.App.1996). We set aside the verdict

only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* at 134. We decline appellant's suggestion that we adopt the factual sufficiency standard of review as proposed by Justice Vance's concurring opinion in *Mata v. State*, 939 S.W.2d 719, 729–30 (Tex.App.— Waco 1997, no pet.) (Vance, J., concurring),[7] and instead follow the standard articulated in *Clewis*.

### A. Arson

Appellant contends that the evidence was legally and factually insufficient to prove that the fire which consumed his home was intentionally set, and that appellant was the one who set the fire. At the time of the offense in question, a person committed arson if he started a fire or caused an explosion with intent to destroy or damage a habitation knowing that it was insured against damage or destruction. Act of April 13, 1989, 71st Leg., R.S., ch. 31, 1989 Tex. Gen. Laws 313, 313 (amended 1993) (current version at TEX. PENAL CODE ANN. § 28.02(a)(2)(B) (Vernon 1994)). If the arson resulted in bodily injury or death, the offense became a first degree felony. Act of April 13, 1989, 71st Leg., R.S., ch. 31, 1989 Tex. Gen. Laws 313, 314 (amended 1993) (current version at TEX. PENAL CODE ANN. § 28.02(d)(1) (Vernon Supp.1998)).

In pertinent part, the indictment alleged that appellant:

> ... did, then and there, with intent to damage and destroy a habitation located on Dabney Road, Brenham, Texas intentionally and knowingly start a fire to the habitation by applying a flammable liquid and igniting it, knowing that the habitation

---

**6.** Points of error four and five attack the legal and factual sufficiency of appellant's conviction for capital murder by arson, which we have vacated. Nevertheless, the *constituent elements* of that offense as charged in the indictment, (1) arson and (2) intentionally and knowingly causing the decedent's death by asphyxiation from soot inhalation, are components of the remaining charges of arson and capital murder by remuneration, and thus are addressed in points of error six through nine.

**7.** There it was suggested that, because the burden of proof in a criminal case is the highest (beyond a reasonable doubt), the standard for reviewing factual sufficiency of the evidence should likewise be higher. *Mata*, 939 S.W.2d at 729–30. We recently rejected a similar plea for a heightened standard of appellate review in parental termination suits involving an elevated (clear and convincing) burden of proof. *In re J.N.R.*, 982 S.W.2d 137, 143 n. 5 (Tex.App.— Houston [1st Dist.] 1998, n. p. h.) (designated for publication).

was insured against damage and destruction, and Frances Fitts by reason of the commission of arson suffered death. . . .

To establish the offense of arson, it must be shown that the edifice was deliberately set on fire, and that the defendant set the fire or was criminally responsible for setting it. *Saenz Machado v.. State,* 753 S.W.2d 252, 253–54 (Tex.App.—Houston [1st Dist. ] ), *writ ref'd per curiam,* 767 S.W.2d 809 (Tex. Crim.App.1989). In a circumstantial evidence case such as this, mere presence at the scene before and after an incendiary fire is insufficient to prove a criminal connection to the fire. *Id.* at 254. Evidence which establishes no more than motive and opportunity will not suffice to prove the *corpus delicti* of arson. *Troncosa v. State,* 670 S.W.2d 671, 680 (Tex.App.—San Antonio 1984, no pet.). However, evidence tending to establish the *corpus delicti* need not be direct, but may be circumstantial. *Penry v. State,* 691 S.W.2d 636, 648 (Tex.Crim.App.1985).

■■■ Appellant asserts that conflicting expert testimony was presented concerning whether the fire was of incendiary origin, whether an accelerant was used, and whether that accelerant was gasoline. Appellant contends that the only "criminal connection" offered by the State to show appellant set the alleged incendiary fire was (1) that he was present at the scene and (2) that his motive was to receive insurance benefits and to be with another woman. However, disagreement between experts is not dispositive. *Davis v. State,* 840 S.W.2d 480, 483 (Tex. App.—Tyler 1992, pet. ref'd). The jurors are to determine the appropriate weight to accord expert testimony, and they may reject such testimony if it fails to comport with the jurors' concepts of sound logic. *Id.*

Concerning the incendiary origin of the fire, the State presented several experts who testified that the fire was intentionally set. Al Young, a fire investigator for the Fort Bend County Fire Marshall's Office, investigated the scene and concluded the fire was intentionally set due to a "pour pattern" evidencing the use of an accelerant. Young also ruled out other potential sources of the fire. Douglas Holmes, also a fire investigator, ruled out other possible origins, such as faulty electrical wiring or a propane gas leak, and concluded that gasoline was used as an accelerant to start the fire. Marvis Green, an electrical engineer and fire investigator, also testified that faulty electrical wiring did not cause the fire. George Cavitt, an officer with the Houston Police Department who has investigated over 50 fires with dogs trained to "alert" to the presence of hydrocarbons, stated that his dogs alerted to several locations on the premises. Samples were collected at those locations, and laboratory testing confirmed the presence of gasoline in one of the samples.

To controvert this evidence, appellant presented the expert testimony of Curtis Huckshorn and Rodney Fauchs, both of whom disagreed with the conclusions of the State's experts. According to Huckshorn, the cause of the fire was accidental, and the State's theory was impossible, based on the physical evidence. Fauchs concluded that an electrical origin of the fire could not be ruled out, and that the State's theory was unsupported by the physical evidence. In addition, appellant presented the testimony of Steven Nicely, a police dog trainer and consultant, and Dan Craig, a doctor of veterinary medicine. Nicely and Craig testified that, based on the training methods of Cavitt, his hydrocarbon-sniffing dogs could not provide reliable results. Finally, appellant called Craig Balliet to rebut the State's chemical evidence. Balliet stated that, based on his test results, the sample which tested positive for gasoline might have been mineral spirits, a substance with which the dogs were unfamiliar.

The State relied on circumstantial evidence to prove appellant set the fire. Kenneth Manus, the first to arrive at the scene, observed that appellant's behavior did not seem appropriate at the time of the fire, because he did not mention that his wife was in the house until asked by Manus. Manus also observed that appellant was not injured, did not cough as if he had been in a smoke-filled room, and was only smeared with soot. Manus further stated, contrary to appellant's assertions, that the windows on the house did not appear to be broken.

Mrs. Dickey, appellant's neighbor, said she did not notice any soot on appellant. Melin-

da Jazerski, an EMS attendant called to the scene, observed that appellant showed no signs of burns or smoke inhalation, or any cuts on his hands or feet. Ray Weiss, a volunteer fireman called to the scene, noticed that appellant did not seem as distraught as he should have been, in light of the fact that his wife was in the house.

Wayne Beum, an Austin County Sheriff's Office employee trained as an EMS attendant, testified that he did not notice any singed hair, burns, or cuts on appellant. Beum testified that appellant's physical condition did not match appellant's statements that he had been awakened in a smoke-filled room. He also testified that appellant did not seem greatly upset, and that appellant's crying would become more intense when a fireman or others on the scene would approach the car where appellant and Beum were sitting.

Charlotte Carr, a nurse on duty at the hospital on the night of the fire, testified that appellant's only injury was a scratch on his forehead. Richard Holloman, an investigator for the Austin County Sheriff's Department, testified that appellant gave inconsistent statements to him at the hospital and at a later meeting between the two. At one point appellant stated that he exited the house through the front door, and subsequently stated that he exited through a side door.

To rebut the State's evidence, appellant refers us to conflicting testimony concerning appellant's appearance and emotional state the night of the fire. He argues that Manus initially testified that appellant had "soot all over him," and that, contrary to the hospital nurse's testimony, appellant's medical records, filled out by an employee who did not testify at trial, reflect that he did have burns on his body. Also, appellant cites to several instances in the record where he did express grief concerning his wife. Appellant's psychologist testified that appellant's display of grief after the fire was normal and appropriate.

We disagree with appellant's assertion that the State presented evidence establishing no more than motive and opportunity. Although appellant did present evidence contradicting the incendiary origin of the fire

and appellant's criminal connection to it, the jury could accept or reject any or all of the evidence presented at trial. *See Davis*, 840 S.W.2d at 483. We hold that the evidence was legally and factually sufficient to support a finding that the fire was deliberately set. In addition, we hold that the circumstantial evidence presented could have led a rational jury to find beyond a reasonable doubt that appellant set the fire by use of an accelerant, and that such a finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

### B. Capital Murder for Remuneration

■ Appellant claims that legally and factually insufficient evidence was presented to support the jury's finding that (1) appellant intentionally and knowingly caused the decedent's death from soot inhalation and that (2) appellant committed murder for remuneration. The jury charge tracked the language of paragraph "B" of the indictment, which provided that appellant:

... did, then and there intentionally and knowingly cause the death of an individual, namely, Frances Fitts, by asphyxiation from soot inhalation, and the murder was committed for [remuneration] and the promise of [remuneration], namely; money from the proceeds of insurance policies with Massachusetts Mutual Life Insurance Company on Frances Fitts in which the defendant is the named beneficiary....

■ Appellant contends that the act causing death, as related in the charge, was inhalation of soot, an act of the decedent and not appellant. Appellant asserts that no evidence exists in the record to support a finding that appellant intentionally and knowingly caused or forced the decedent to inhale a sufficient amount of soot to kill her. However, instead of assessing the sufficiency of the evidence according to the charge given, we must measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). A hypothetically correct jury charge accurately describes the particular offense for which the defendant was tried. *Id.* The

purpose of comparing the sufficiency of the evidence with a hypothetically correct jury charge is to ensure that a judgment of acquittal is entered only in those situations in which there is an actual failure in the State's proof, rather than a mere error in the jury charge. *Id.*

In this case, a hypothetically correct jury charge would have stated the act of appellant which caused the death of the decedent, setting fire to the house, rather than the cause of death resulting from that act, asphyxiation from soot inhalation. We have previously held that the evidence presented at trial was legally and factually sufficient to prove appellant committed arson. Based on the evidence as outlined above, we hold that legally and factually sufficient evidence was presented to prove that appellant intended to engage in the act that caused the death described in paragraph "B" of the indictment, namely, setting fire to the home. *See Kinnamon v. State,* 791 S.W.2d 84, 88–89 (Tex.Crim.App. 1990) (accused must be found to have intended to engage in the act that caused the death).

 Appellant also contends that the evidence presented at trial was legally and factually insufficient to prove that appellant committed murder for remuneration. Appellant alleges that no evidence was presented showing (1) a recent change in insurance coverage or (2) any statements by appellant probative of his intent to kill for money.

 The Penal Code does not define "remuneration" or the "promise of remuneration," but those terms are not limited to murder-for-hire situations. *Urbano v. State,* 837 S.W.2d 114, 116 (Tex.Crim.App.1992). Rather, those terms encompass a broad range of situations, including compensation for loss or suffering and the idea of a reward given or received because of some act. *Id.* Circumstantial evidence is most often used to prove the requisite mens rea, and one's actions are generally reliable circumstantial evidence of one's intent. *Parrish v. State,* 950 S.W.2d 720, 722 (Tex.App.—Fort Worth 1997, no pet.). In the case of insurance benefits, circumstantial evidence may be sufficient to sustain a finding that the appellant intended to murder for remuneration. *Id.*

At trial, the State called John Brieden, a State Farm insurance agent, who testified that appellant, without his wife present, requested a change in his homeowners insurance in 1992. Appellant negotiated an increase in the policy amount to approximately $137,325. Additionally, he requested and received an increase on the coverage for the contents of the home to $100,000. Brieden testified that the increase on the contents of the home was out of the ordinary, because the contents coverage is usually only 60 percent of the amount of coverage on the home itself.

The State then called Randy Rother, a life insurance agent, who testified that in 1990 appellant, without his wife present, met with him to discuss obtaining life insurance for both appellant and his wife. Rother testified that appellant gave no specific reason for requesting the coverage, and that it was not typical for someone to walk in off the street and request life insurance. Appellant originally applied for $150,000 in coverage on his wife, which was later increased, upon request, to $300,000. Appellant was listed as the beneficiary on his wife's policy.

The State also presented testimony from Joe Golson, Assistant Director for Member Benefits with the Employees Retirement System of Texas, who testified that appellant's wife had $64,000 in retirement benefits, for which appellant was the beneficiary. Appellant was also the beneficiary of a $222,000 life insurance benefit through his wife's employer. Appellant presented no contrary evidence to rebut the State's evidence concerning insurance coverage.

The State also called David Munns to testify concerning his daughter's relationship with appellant. Munns testified that appellant had traveled to England with Tracy on two occasions, and had discussed marrying Tracy after she graduated from college. After Tracy moved to the Phillippines, appellant continued to call her prior to the fire. The State also called Benton Miller, who testified that he met with appellant approximately eight days after the fire, and purchased appellant's Mercedes–Benz vehicle. Miller had responded to an advertisement

placed in the paper by appellant on May 30, 1994, over a week before the fire, which read "Must sell. Leaving country." Finally, the State called Merlin Cryer, a friend of appellant for 12 years, who testified that appellant told him in 1986 that if he could ever figure out a way to kill his wife, he would.

Although the State's evidence relating to the insurance coverage on appellant's home and wife did not reflect a recent change in coverage, the evidence did reflect a substantial amount of coverage requested by appellant, some obtained based on unknown purposes without appellant's wife being present. Appellant presented no evidence to refute the State's evidence concerning the insurance coverage of appellant's home and wife. In addition, the testimony concerning appellant's relationship with Tracy Munns and his sale of the Mercedes subsequent to the fire could have led a reasonable jury to believe that appellant was in need of funds in order to reunite with Munns in the Phillippines. Appellant presented no evidence refuting the testimony concerning appellant's relationship with Munns or the sale of the vehicle. Viewing the evidence in the proper light, we hold that the evidence was legally sufficient to support a finding that appellant committed murder for remuneration. In addition, we hold that such a finding was not against the overwhelming weight of the evidence so as to be clearly wrong or unjust.

We overrule appellant's sixth, seventh, eighth, and ninth points of error.

### Cross–Appeal

The State has filed a cross-appeal alleging that the trial court erred in refusing to admit portions of appellant's deposition taken in a civil proceeding to determine the proper disposition of benefits due Mrs. Fitts from the Employees Retirement System of Texas. However, because the State prevailed at trial, and because we uphold the decision of the trial court on appeal, we need not address this issue. This Court is not authorized to render advisory opinions. *Perez v. State,* 938 S.W.2d 761, 764 (Tex.App.—Austin 1997, pet. ref'd).

### Conclusion

We affirm the arson judgment, and, having vacated the capital murder by arson portion, we also affirm the capital murder judgment.