Opinion issued December 8, 2005.
     












In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00880-CR




ROBERT CHARLES CARLSON JR., Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 174th District Court
Harris County, Texas
Trial Court Cause No. 988532




MEMORANDUM OPINION

          On November 17, 2005, appellant filed a petition for discretionary review.
Pursuant to Texas Rule of Appellate Procedure 50, and within 30 days of the filing
of said petition, the Court withdraws its opinion and judgment issued November 3,
2005 and issues this corrected opinion and judgment in their stead. See Tex. R. App.
P. 50. 
          Appellant, Robert Charles Carlson Jr., was charged by indictment with the
first-degree-felony offense of intentional and knowing injury to a child. A jury found
appellant guilty of the lesser included second-degree-felony offense of reckless injury
to a child and, having found an enhancement paragraph alleging a prior conviction
for burglary of a habitation true, assessed his punishment at 55 years in prison and a
$10,000 fine. See Tex. Pen. Code Ann. § 22.04(a)(1)(Vernon 2003). We determine
whether the evidence was (1) legally and factually sufficient to prove appellant
committed the offense and that he did so recklessly; and (2) legally sufficient to prove
appellant used either his hands or an unknown object as a deadly weapon. We affirm.
Background
           Appellant and his girlfriend, April Faterkowski, lived together and had a son,
C.C., on February 6, 2003. C.C. was a healthy baby. Faterkowski took care of him
for six weeks while she was on maternity leave. Thereafter, C.C. was cared for by
appellant, Faterkowski, and her mother, Jacqueline Glass.


 Appellant was responsible
for taking care of C.C. primarily in the evenings from about 6:00 p.m. to 10:00 p.m.,
while Faterkowski was at work. 
          On April 5, 2003, Glass stopped by appellant’s house to check on C.C. because
he had been constipated and had not eaten for two days. Glass was not comfortable
with appellant taking care of C.C. She found appellant alone with C.C., who was
lying on the couch in a daze. When Glass picked him up, C.C. was limp and began
vomiting. Glass believed that C.C. had been over-medicated. Glass told appellant that
C.C. needed to be taken to the doctor or the emergency room. Appellant did not seem
concerned about C.C. and acted as if he did not want to take care of him.
          At Glass’s prompting, appellant called Faterkowski, and they both took C.C. to
the Cypress Fairbanks Hospital (“Cy-Fair”) emergency room. Dr. Juan Cavazos
examined C.C. and determined that he was awake and alert. Faterkowski told the
doctor about C.C.’s vomiting and constipation, but did not mention any history of
shaking or loss of consciousness. Dr. Cavazos testified that he noticed nothing
abnormal regarding C.C.’s neurological state. As a precaution, Dr. Cavazos ordered
blood tests and a chest x-ray, but did not find anything abnormal. C.C. was discharged
about 7:30 p.m. and went home with Faterkowski and appellant.
          About 3:00 a.m. on April 6, Faterkowski and appellant were awakened by
C.C.’s grunting. Appellant carried the baby into the living room and told Faterkowski
to go back to sleep because she had to work the next day. About 15 minutes later,
Faterkowski got up and found C.C. seemingly asleep on the couch with appellant. 
When appellant took Faterkowski to work at 10:00 a.m., C.C. was still not awake and
was lying on the couch. Glass arrived at appellant’s house around 11:00 a.m. and
noticed that C.C. appeared different from the day before. C.C. was moaning and
posturing with his right arm in front of his body. His right eye drooped more than his
left. Appellant seemed frustrated and irritated, but unconcerned about the baby’s
noises or body movements. Glass took C.C. home with her and called C.C.’s
pediatrician. After several hours, C.C. began having seizure-like symptoms.
          Appellant and Faterkowski took C.C. back to the Cy-Fair emergency room
around 9:00 p.m. that night. On this visit, Dr. George Pettit noticed that C.C. had 
decerebrate posturing,


 his right eye-lid was droopy, and his right pupil was non-responsive to light, all of which were symptoms indicative of a brain injury. Dr. Pettit
also noticed that C.C. had a stiff neck and tense fontanel,


 indicating internal pressure. 
Dr. Cavazos saw C.C. that evening and testified that his condition was completely
different from that of the night before. Blood tests and a CAT scan indicated possible
bleeding in the head.
 
          C.C. was moved to Texas Children’s Hospital on April 7, 2003 at about 1:15
a.m., where he was examined by Dr. Fernando Stein, chief of the intensive care unit
at Texas Children’s Hospital. Dr. Michael Morriss, a pediatric neuroradiologist, read
C.C.’s MRI and CAT scans. The tests revealed that C.C. had sustained two injuries:
a small, old injury that would have led to vomiting, and a new, larger injury of the
entire brain, which caused retinal hemorrhaging, a symptom of shaken-baby syndrome.
          Dr. Stein ruled out all blood disorders and determined that C.C. had sustained 
a non-accidental, traumatic injury. C.C. was ultimately diagnosed with a diffuse
axonal injury to his brain, which is usually caused when a child is shaken, resulting
in internal bleeding, oxygen loss, and swelling of the brain. The injury is immediately
incapacitating and can lead to seizures, lost consciousness, and breathing difficulties. 
C.C.’s brain deteriorated to water after the second injury, and was thus non-functional. 
C.C. will never be able to walk, to talk, to think, to see, or to have any of his senses. 
          Dr. Stein testified that this type of injury involved “fast velocity and the impact
of the brain against the inner table of the skull at least once, very likely more than
once.” According to Dr. Stein, a reasonable person would be able to know that that
type of force would lead to a serious bodily injury. Dr. Stein further testified that
C.C.’s injury was caused by a deadly weapon, whether by hands or by an unknown
object. He also testified that a new injury occurred between C.C.’s release from the
Cy-Fair hospital on April 5, 2003 and his readmittance on April 6, 2003.
          Faterkowski testified that she was never rough with C.C. and had never dropped
or shaken him. However, she testified that there were several times when appellant
was rough with C.C. When C.C. was one month old, she had seen appellant bouncing
C.C. roughly on his knee while C.C.’s arms flopped around, and C.C. did not have
control of his body. There were also a few times when appellant had picked up C.C.
by the legs and bounced him on the bed to keep him calm. Additionally, appellant
would throw C.C. five to six inches in the air and catch him. Appellant would also
hold the baby by the back and neck, pretending that C.C. was an airplane. 
          Appellant supplied Detective Richard Castillo with two voluntary statements,
which were introduced into evidence. In the statements, appellant admitted that he
would bounce C.C. on the bed by his legs if he got fussy and that, on a prior occasion,
he had put his hand on the baby’s head and pushed C.C. into the car seat. Two weeks
before C.C. was admitted to the hospital, while appellant was giving C.C. a bath, he
had found C.C.’s head lying on the side of the baby tub with his eyes rolled back. 
Appellant shook C.C. until he became responsive. While visiting appellant’s brother,
a week before C.C. was taken to the hospital, appellant had picked up C.C. too fast,
and his head snapped back. Appellant’s brother had told him that “[y]ou are going to
break [C.C.’s] neck before he can even play football.”
          After the presentation of the evidence, the trial court instructed the jury, in
accordance with the indictment, that the jury could convict appellant of injury to a
child if it found beyond a reasonable doubt that appellant intentionally, knowingly,
recklessly, or with criminal negligence caused serious bodily injury to C.C. The
prosecution alleged that appellant caused serious bodily injury to C.C. by either
shaking C.C. with his hands, by striking C.C.’s head with or against an unknown
object, by throwing C.C. to the floor or down onto an unknown object, or by causing
serious bodily injury to C.C. by an unknown manner or means and that, in doing so,
appellant either used or exhibited a deadly weapon,


 i.e. his hands or an unknown
object. After deliberating, the jury found appellant guilty of recklessly causing serious
bodily injury to C.C. and also found that appellant either used or exhibited a deadly
weapon during the commission of the offense. 
Legal and Factual Sufficiency
          Appellant contends that (1) the evidence was legally and factually insufficient
to show that he caused C.C.’s injuries; (2) the evidence was legally and factually
insufficient to show that he acted recklessly; and (3) the evidence was legally
insufficient to show that he used or exhibited a deadly weapon, as alleged in the
indictment.
 
A.      Standards of Review
          In determining the legal sufficiency of the evidence, we review the evidence in
the light most favorable to the verdict to determine whether any rational fact finder
could have found the essential elements of the offense beyond a reasonable doubt. 
Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Escamilla v.
State, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004). We may not re-weigh the
evidence or substitute our judgment for that of the fact finder. King v. State, 29
S.W.3d 556, 562 (Tex. Crim. App. 2000). This standard of review is the same for both
direct- and circumstantial-evidence cases. Fitts v. State, 982 S.W.2d 175, 185 (Tex.
App.—Houston [1st Dist.] 1998, pet. ref’d). If there is evidence that establishes guilt
beyond a reasonable doubt and the jury believes the evidence, the judgment must be
affirmed. Id.
          In a factual-sufficiency review, we view all the evidence in a neutral light, and
we will set aside the verdict only if the contrary evidence is so strong that the verdict
is clearly wrong and manifestly unjust or the evidence is so weak that the standard of
proof of beyond a reasonable doubt could not have been met. Zuniga v. State, 144
S.W.3d 477, 483 (Tex. Crim. App. 2004). We review the evidence that tends to prove
the existence of the elemental fact in dispute and compare it with the evidence that
tends to disprove that fact. Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App.
1996). However, we must avoid substituting our judgment for that of the fact finder.
Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). The fact finder is the sole
judge of the weight and credibility of witness testimony and may accept or reject any
alternative theory of causation. Zuniga, 144 S.W.3d at 483; Sharp v. State, 707
S.W.2d 611, 614 (Tex. Crim. App. 1986). We must defer appropriately to the fact
finder to avoid substituting our judgment for its judgment. Zuniga, 144 S.W.3d at
481-82.
B.      Causation
          In his first and second points of error, appellant contends that the evidence is
legally and factually insufficient to show that he caused C.C.’s injuries. 
          Viewed in the light most favorable to the verdict, the evidence in this case
showed as follows: (1) appellant was alone with C.C. when the serious bodily injury
occurred; (2) in a statement to the police, appellant admitted having shaken C.C. until
he became responsive and picking up C.C. too fast, so that his neck snapped back; (3)
Faterkowski related several prior incidents in which appellant had handled C.C.
roughly by throwing him five to six inches in the air, bouncing him roughly on his
knee, and holding C.C. only by his back and neck; (4) Drs. Stein and Morriss both
concluded that C.C.’s death was not accidental and that his injuries were inflicted by
someone; (5) Dr. Stein stated that the swelling of C.C.’s brain was a result of shaking,
which involved high velocity impact of the brain against the inner table of the skull;
(6) appellant acted indifferent and detached when C.C. was ill and in the hospital; and
(7) Faterkowski had never shaken C.C. or handled him roughly. Accordingly, we
conclude that a reasonable juror could have found that appellant caused C.C.’s injury.
We hold that the evidence is legally sufficient to show that appellant caused C.C.’s
injuries.
          We next turn to the factual sufficiency of the evidence. Appellant’s phrases his
challenge solely as one based on the “greater weight and preponderance of the
evidence” standard. In our review, we must consider the most important evidence that
appellant claims undermines the jury’s verdict. Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003). In this regard, appellant contends that the State’s case was
built on the premise that he had sole access and control over C.C. Appellant asserts
that C.C.’s mother and grandmother also had access and control over C.C. on April 5
and 6, the time frame in which the injuries most likely occurred. Appellant also
contends that he had denied handling the baby roughly to Detective Castillo and that,
because the evidence never contradicted his denial, there was insufficient evidence to
establish his rough handling of C.C. 
          Contrary to appellant’s contentions, the State presented evidence indicating that
only appellant could have caused the serious bodily injury. The record reflects that
the newer injury that caused C.C.’s serious bodily harm occurred between the baby’s
release from the hospital at 7:30 p.m. on April 5 and his return to the hospital around
9:00 p.m. on April 6. After his release from the hospital on April 5, C.C. woke up
grunting at about 3:00 a.m. Appellant took the baby into the living room alone. When
Faterkowski checked on C.C. and appellant 15 minutes later, C.C. appeared to be
sleeping on the couch. The next morning when Faterkowski was dropped off at work
at around 10:00 a.m., C.C. still appeared to still be sleeping. When Glass arrived at
appellant’s home around 11:00 a.m., C.C. was awake, but exhibiting symptoms of a
head injury. Appellant was the only one alone at home with C.C. The physicians
testified that, with C.C.’s type of injury, the symptoms were immediately
incapacitating and would typically occur within a short period of time after the injury. 
The jury could have surmised that C.C. was rendered unconscious from an injury
inflicted upon him by appellant during appellant’s time alone with C.C., i.e., either
when he took C.C. to the living room at 3:00 a.m. or after he returned from driving 
Faterkowski to work at 10:00 a.m. The jury could have reasonably given credence to
this evidence and rejected the theory that the baby’s mother or grandmother caused
serious bodily injury to C.C. See Zuniga, 144 S.W.3d at 483.
          The State also presented evidence establishing that appellant had handled C.C.
roughly. Although Faterkowski testified that appellant was protective of C.C. and that
he was not violent toward C.C., she also testified about several prior incidents in
which appellant had handled C.C. roughly. Faterkowski’s testimony was corroborated
by Glass, who stated that she was always concerned that appellant was being too rough
with C.C. Moreover, in a statement to the police, appellant admitted shaking the baby
until he became responsive two weeks before C.C. was admitted to the hospital. The
State also produced evidence that appellant’s reaction to his son’s diagnosis was
unusual. Doctors, medical staff, and Glass all testified that appellant seemed detached
from C.C. in the hospital. Given the evidence, the jury simply may not have believed
appellant’s denial that he had not played roughly with C.C. The jury as fact finder had
sole responsibility for weighing the testimony. See id. 
          Accordingly, we conclude that the State’s proof that appellant caused serious
bodily injury to C.C. is not greatly outweighed by contrary proof that is so strong that
the verdict is clearly wrong and manifestly unjust and that the State’s evidence is not
so weak that the standard of proof of beyond a reasonable doubt could not have been
met. See id. Viewing all of the evidence in a neutral light, we hold that the evidence
is factually sufficient to show that appellant caused C.C.’s injuries.
          We overrule appellant’s first and second points of error.
C.      Recklessness
 
          In his third and fourth points of error, appellant contends that the evidence is
legally and factually insufficient to establish that he acted recklessly in causing C.C.’s
injuries. Specifically, appellant asserts that there is legally and factually insufficient
evidence to show that he was either aware of the risk to C.C. or that he consciously
disregarded the risk. 
 
          The Penal Code provides that “a person acts recklessly, or is reckless, with
respect to circumstances surrounding his conduct or the result of his conduct when he
is aware of but consciously disregards a substantial and unjustifiable risk.” Tex. Pen.
Code Ann. § 6.03(c) (Vernon 2003). Viewed in the light most favorable to the
verdict, the evidence shows that appellant was aware of, but consciously disregarded,
the substantial and unjustifiable risk that C.C. would sustain serious bodily injury. 
First, the doctors at trial testified that C.C.’s severe injuries were the result of violent
shaking or high-impact force. Dr. Stein testified that a reasonable person would have
known that the type of brutal force inflicted upon C.C. would likely have caused
seriously bodily injury. Moreover, in appellant’s statement to the police, he admitted
that Faterkowski, Glass, and his brother had criticized his rough treatment of C.C. in
the past. Therefore, not only would a reasonable person be able to tell the type of
force necessary to cause serious bodily injury to a child, but appellant had received
specific criticism that his behavior would lead to injury and serious bodily harm of
C.C. We hold that the evidence is legally sufficient to show that appellant was aware
of and consciously disregard the risk in causing C.C.’s injuries.
          We next turn to the factual sufficiency of the evidence. Appellant phrases his
challenge solely as one based on the “greater weight and preponderance of the
evidence” standard. In our review, we must consider the most important evidence that
appellant claims undermines the jury’s verdict. Sims, 99 S.W.3d at 603. In this regard,
appellant relies on his denial of rough play in his statement to Detective Castillo, as
well as on Faterkowski’s statement that she believed that appellant had not played
roughly with C.C. However, the evidence also shows that appellant admitted that he
had shaken C.C., who was only six weeks old, until he became responsive; had picked
up C.C. so fast that his neck snapped back; had thrown C.C. five to six inches in the
air; and had held C.C. only by his back and neck. The State’s proof was sufficient to
show that appellant acted recklessly in causing C.C.’s injuries. A reasonable jury may
simply have disbelieved appellant’s claim that he was unaware of the risk to C.C. or
that he did not consciously disregard it. We conclude that the State’s proof that
appellant acted recklessly in causing C.C.’s injuries is not greatly outweighed by
contrary proof so strong that it renders the verdict clearly wrong and manifestly unjust
and that the evidence is not so weak that the standard of proof of beyond a reasonable
doubt could not have been met. See Zuniga, 144 S.W.3d at 483. Viewing all of the
evidence in a neutral light, we hold the evidence to be factually sufficient.
          We overrule appellant’s third and fourth points of error.
D.      Deadly Weapon
          In his fifth point of error, appellant contends that the evidence is legally
insufficient to establish that a deadly weapon was used or exhibited during the
commission of the crime because the record fails to show beyond a reasonable doubt 
 
that appellant intended to use his hands or any other object in a manner so as to cause
C.C. serious bodily injury. 
          Texas Penal Code Section 1.07(a)(17)(B) provides, in relevant part, that a
“deadly weapon” is “anything that in the manner of its use or intended use is capable
of causing death or serious bodily injury.” Tex. Pen. Code Ann. § 1.07(a)(17)(B)
(Vernon 2005). Texas Penal Code Section 1.07(a)(46) provides that “‘serious bodily
injury’ means bodily injury that creates a substantial risk of death or that causes death,
serious permanent disfigurement, or protracted loss or impairment of the function of
any bodily member or organ.” Tex. Pen. Code Ann. § 1.07(a)(46) (Vernon 2005). 
The Texas Court of Criminal Appeals has recognized that a hand may be a deadly
weapon within the meaning of section 1.07(a)(17), “depending upon the evidence
shown.” Turner v. State, 664 S.W.2d 86, 90 (Tex. Crim. App. 1983). To determine
whether something is a deadly weapon, the jury may consider all the surrounding facts,
including the defendant’s words. Blain v. State, 647 S.W.2d 293, 294 (Tex. Crim. App.
1983). The State needed to prove only that appellant’s hands were capable of causing
serious bodily injury in the way that they were used or intended to be used. See Hill v.
State, 913 S.W.2d 581, 584 (Tex. Crim. App. 1996).
          Viewed in the light most favorable to the verdict, the evidence presented at trial
established that C.C.’s injuries were caused by violent shaking or very high-impact
force. Dr. Stein testified that a deadly weapon, whether hands or an unknown object,
caused C.C.’s injury. Drs. Stein and Morriss testified that C.C.’s retinal hemorrhaging
was a hallmark of shaken baby syndrome and that C.C.’s injuries were the result of
violent shaking or a violent slam. As a result of the injuries inflicted by appellant, C.C.
suffered retinal hemorrhaging and a diffuse axonal injury, which ultimately led to
C.C.’s brain’s becoming non-functional. Considering the evidence in the light most
favorable to the verdict, we hold that the evidence was legally sufficient to persuade
a rational trier of fact beyond a reasonable doubt that appellant used his hands or an
unknown object as a deadly weapon.
          We overrule appellant’s fifth point of error.
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                   Tim Taft
                                                   Justice
 
Panel consists of Justices Taft, Keyes, and Hanks.
 
Do not publish. See Tex. R. App. P. 47.2(b).