Opinion issued March 10, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-08-00939-CR

———————————

Ryan Rashad Merritt, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 400th District Court 

Fort Bend County, Texas



Trial Court Case No. 46598

 



MEMORANDUM OPINION

          A
jury found appellant, Ryan Rashad Merritt, guilty of the offense of arson of an
insured and mortgaged vehicle,[1] and the trial court
assessed his punishment at confinement for ten years and one day.  In four issues, appellant contends that the
evidence is legally and factually insufficient to support his conviction, the
trial court erred in admitting evidence of extraneous offenses during the guilt
phase of trial, and the cumulative effect of the trial court’s errors deprived him
of a fair trial.  

          We
reverse and render a judgment of acquittal.

Background

Fort Bend County Fire Marshal
Investigator M. Cornell testified that on December 17, 2006, he was dispatched
to investigate the burning of a black GMC Yukon Denali, a sports utility
vehicle (“SUV”), which had been found outside of a home.  He explained that the homeowner discovered an
“abandoned vehicle,” realized it was “burned inside,” and then contacted his
office.  When Cornell arrived at the
scene, the SUV was in a “grass field,” but he did not see any “tire tracks, big
truck tracks or anything in front of or behind” the SUV.  He also did not see anything indicating that
a “wrecker” had been present.  

Cornell’s inspection revealed that
the SUV had no fire damage on its outside and the front of the SUV appeared to
be in good condition, “with no damage” or “indication of fire to the engine
compartment.”  He found three unburned,
wooden matches outside of the SUV.  Although
the driver’s door had been damaged by what appeared “to be attempted forcible
entry,” Cornell opined that “the damage to the top of [the] latching mechanism
[was not] even open enough to allow a tool to get down in [the door] to be able
to lift it up.”  When he approached the
inside of the SUV, he saw that the seats, door covers, door panels, glove box,
radios, and electronics had been removed. 
Cornell also saw “some pieces of paper” that were partially burned, and he
noted that there was “no fire damage at all from the dash compartment” or the
“electronics area,” which would have indicated a fire of mechanical origin.  Cornell noted “three separate areas of fire
that [were] not contiguous to each other,” which indicated that the fire had
separate points of origin, constituting a “red flag” that the “fire was
intentionally set.”  Around each point of
origin, he found “fine paper,” which he described as being “like a
newspaper.”  

Cornell ruled out all accidental
causes of the fire, and he opined that it was set intentionally.  He noted that there was no damage to the SUV’s
steering column and its keys were not in its ignition.  Cornell then learned that the SUV had been
reported stolen, and he contacted the Houston Auto Theft Task Force.  At the time that he had collected the matches
from outside the SUV, Cornell was not sure if the matches were “crucial”
evidence, but he explained that they would have been crucial had he been able
to find a similar match or matches on a “person of interest” or if he could
identify the matches and “make a connection” to the home of such a person.  Cornell opined that the fire was started by
someone who had “ignited the paper products” found in the SUV, but he was
unable to determine if a match, lighter, or some other item was used to ignite
the paper.  

Cornell further testified that he
contacted appellant, the owner of the SUV, who had reported it as stolen.  In a statement given to Cornell, appellant explained
that during the evening prior to the theft of the SUV, he had parked it outside
the apartment of a friend, Floyd Houston. 
Appellant and Houston went out for the evening, and the two “hung out at
[Houston’s apartment] for four or five hours and . . . then went out to Scott’s
Club and another [club] off of Cullen [Street].”  They “had been out all night just sitting in
the parking lot, watching people at these bar locations and drinking.”  Appellant last saw the SUV at 6:30 p.m., when
he had parked it outside Houston’s apartment. 
When appellant returned to Houston’s apartment around 5:00 a.m., he found
that the SUV was missing, even though he was in possession of both sets of
keys.  

Cornell explained that because the
type of matches that he found outside of the SUV are “common,” he asked
appellant if he had any wooden matches or gasoline at his apartment.  Appellant replied that he did not use wooden
matches, noting that his apartment was not equipped with gas appliances.  Approximately one month after speaking with
appellant, Cornell went to appellant’s apartment complex and spoke with the
manager, who indicated that appellant previously had a separate lease on a
garage, but he had informed her that he no longer needed it after his SUV was
stolen.  The manager allowed Cornell to
enter the garage, where he found “several bags of what appeared to be
trash.”  Inside the bags, Cornell found a
“Cartronix envelope,” “the [SUV’s] window sticker,” “receipts,” and other items
that he “believed to be the contents of the glove box or the inner console” of
the SUV.  

Ofelia Stevens, a Texas certified
court reporter, testified that on May 9, 2007, she recorded a sworn statement
of appellant regarding an insurance claim that he had made concerning the theft
of his SUV.  In his statement, appellant
explained how he had obtained financing for the SUV and his relationship with
David Ross, a man he had met at a mall in the “mid part of 2002.”  After appellant and Ross had initially talked
“about sports,” they exchanged telephone numbers, and appellant would call Ross
“every once in awhile” to talk about sports and trucks.  In 2006, appellant told Ross that he was going
to purchase a new SUV, but he needed a cosigner on a loan to “make a better
deal.”  Ross then offered to cosign on a
loan for the purchase, and he met appellant at the mall for Ross to sign
appellant’s loan application.  Appellant
explained that he and Ross did not go to the dealership together, but
separately.  Appellant made a $6,000 down
payment on the SUV, and he stayed current on the $996 monthly payments.  Using his Compass Check Card, appellant also
purchased for the SUV “after-market” “24-inch rims and tires” that had a value
of $4,500.  However, he paid less than
$4,500 for the rims and tires because he “negotiated them down.”  Appellant noted that a few months after the
purchase of the SUV, he stopped speaking with Ross because he had tried to call
Ross and discovered that “his phone was disconnected.”  

David Ross testified that in about
November 2007, he began receiving telephone calls from a creditor, who told him
that he was behind on payments due for some tires purchased in Houston, Texas.  Ross explained that he lives in Dallas, and,
although, in 2005, he came to Houston for a job interview, he did not purchase
any tires in Houston.  Also, Ross noted
that he had never been to a tire store in Houston.  After speaking with the creditors, Ross
obtained a copy of his credit report, in which he discovered the purchase of
tires and a GMC Yukon Denali that had taken place without his authorization.  He explained that at that time, the only cars
that he had ever purchased were a Lexus RX 300 and a Ford Escape.  After reviewing his credit report, Ross
contacted the creditors, identified himself, and informed the creditors that he
had not authorized the purchases.  

Ross later obtained copies of the
documentation of the purchase of the tires, and he confirmed that the purchases
were made under his name and with his social security number and birth date.  The documents were signed with the name
“David Ross.”  He explained, however,
that he did not sign the documents or authorize anyone to sign them in his
name.  Ross also obtained copies of the
documentation for the purchase of the GMC Yukon Denali, and he was listed as “part
owner” and a “cosigner.”  The documents
contained his personal information and were signed with the name “David
Ross.”  Again, however, Ross explained
that the signature was not his and he did not authorize anyone to sign his
name.  After the State introduced into
evidence copies of these documents, along with a copy of Ross’s driver license,
for a comparison of the signatures, Ross noted that there were “no
similarities” between his signature on his driver license and the signatures on
the tire and SUV purchase documentation. 
Ross further testified that he had never met appellant nor did he know
appellant.  Ross explained that the
creditors recommended that he “submit an affidavit” and “file a police report”
about the use of his identity to make the purchases.  He stated that he filed a police report in
“about the middle of December,” but he did not file or pursue any criminal
charges against appellant.

          Carlos
Mesa, president of Cartronix, testified that on March 27, 2006, appellant
purchased “tires and rims” from his business. 
Appellant financed part of the purchase, which required him to complete
an application process to determine whether he qualified for financing.  Mesa explained that this particular
transaction was done in the name of “David Ross,” and a man presented to Mesa identification
in the name of David Ross.  Mesa also
testified that the keys to a GMC Yukon Denali cannot be copied, and, if copied,
the copy would only unlock the doors of the SUV and not start it.  He explained that if the SUV had not been “hotwired”
and the steering wheel column broken, the only way to move the SUV would have
been to use a key to start it and drive it or have it towed.  

          Mike
Nguyen, finance manager at Gay Pontiac, testified that in March 2006, he
reviewed and approved the financing of a loan for a 2006 GMC Yukon Denali in
the names of “David Ross” and “Ryan Merritt.” 
He explained that a man who represented himself as “David Ross,” the
father of appellant, wanted to help his son purchase the SUV by cosigning the
loan.  Nguyen noted that the “David Ross”
present on the day of the financing was not the David Ross who had testified
earlier in the trial.  He further
explained that Denalis are equipped with certain security features, including a
key that contains a “chip,” which prevents the SUV from being started without
the key.  

Chris Walker testified that he worked
at Gay Pontiac in March of 2006, and he was involved in the sale of the SUV to appellant.  He explained that appellant’s father, “David
Ross,” called about the purchase of the SUV, and Walker obtained his credit
information over the telephone.  Walker then
had Ross come to the dealership to complete the paperwork; however, appellant
did not come to the dealership with him. 
Approximately one and one-half of a week later, Walker met with appellant
at a fast food restaurant to complete the paperwork.  Walker explained that the keys to a GMC Yukon Denali
are equipped with a “theft-determining system,” meaning that the keys have a “chip”
inside.  He explained that in order to
get a “key cut to the ignition,” one must obtain approval through General
Motors by supplying it with a copy of a social security card and driver’s
license before a key code can be released to the service department to “cut a
key.”  

Lana Reinecker, a branch manager at
Wells Fargo Bank, testified that it made a loan in appellant’s name in the
amount of $49,015.57.  She explained that
on December 17, 2006, the $994.69 monthly payment due to Wells Fargo was two
months in arrears.  Reinecker noted that
this particular SUV was purchased with no down payment, Wells Fargo had written
“the loan off at $32,671.50,” and it had suffered a loss for the value of the
loan.  

Allstate Insurance Special
Investigations Unit member David Thorsen testified that in January 2007, he investigated
appellant’s insurance claim for potential fraud.  He explained that under the conditions of
Allstate’s insurance policy, an insured agrees to cooperate in any investigation
and a failure to cooperate will result in the denial of any claim.  Thorsen noted that an insured also agrees to
submit to an “examination under oath,” which will be recorded by a court
reporter.  After appellant had filed his
insurance claim, Thorsen met with him and obtained a recorded statement.  In his statement, appellant explained that
the last time that he had seen the SUV was on a Saturday night at approximately
6:30 p.m. after he had driven it to Houston’s apartment, exited it, locked it,
and left it in the parking lot.  Appellant
had one set of keys with him, and the other set was “safeguarded” at his
house.  He stayed at Houston’s apartment until
approximately 9:00 p.m. when the two left to go “drinking,” and after they had returned
at approximately 5:00 or 6:00 a.m., appellant realized that his SUV was missing.
Appellant called for police assistance and reported the SUV missing, and he
returned to his home and watched some television.  He informed Thorsen that for a cost of “close
to $5,000” he had added some rims and tires to the SUV about two weeks after he
had purchased it.  In response to
Thorsen’s questioning, appellant answered that he did not have any debts in
collection, he did not have any information or leads or suspects as to who took
his SUV, and he did not have any personal involvement with the theft of his SUV.  

In a supplemental recorded
statement, appellant provided additional information concerning the keys to his
SUV.  Appellant stated that “about two
months” before the theft of his SUV, he had taken it to a car wash to have it “detailed,”
and the keys “went missing.”  He then had
his wife bring his second set of keys to the car wash, but he remained at the
car wash.  “Maybe five hours” after having
lost his keys, and shortly before the Sheriff’s department was to be notified
that they were missing, a man approached appellant and said, “Oh, I took your
keys.”  Appellant did not know from where
or when the man had taken his keys or if the man was an employee of the car wash.  Thorsen explained that he had asked appellant
several questions about the keys because “the biggest thing in any vehicle
theft is . . . to follow the keys.”  He
noted that if a SUV is stolen and there is no steering column or ignition
breach, someone had to have keys to drive the SUV.  When the owner has the keys under such
circumstances, “there is a problem with that.”  As part of his investigation, Thorsen inspected
the SUV, and he opined that there was “forced entry” into the SUV. 

Thorsen also had appellant fill out
an “Affidavit of Vehicle Theft” as part of the claims process.  He explained that Allstate typically requests such
an affidavit so that the statements made therein can be compared with any
recorded statement to check for inconsistencies.  During his investigation, Thorsen discovered
a number of inconsistencies in appellant’s statements, including those
concerning the time that he had last seen the SUV; the price of and how he had paid
for the after-market rims and tires; the events surrounding his missing keys at
the carwash; his statement that he had made a down payment of $6,000, when he
had made no down payment; his being behind on payments; the fact that the receipts
for the rims and tires were found in his garage when he had said that they were
in the SUV; the fact that the rims and tires were bought in the name of “David
Ross,” but appellant had said that he had paid for them with a check card; and
the fact that appellant had used a different address on his application to
purchase the SUV than the address that he had used for the investigation.  Thorsen explained that appellant’s claim was
initially denied “for noncooperation,” but the insurance company reserved its “rights
for fraud.”  

Standard of Review

We review the legal sufficiency of the evidence “by
considering all of the evidence in the light most favorable to the prosecution”
to determine whether any “rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt.”  Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S. Ct.
2781, 2788–89 (1979).  Evidence is legally insufficient when
the “only proper verdict” is acquittal.  Tibbs v. Florida, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2218 (1982).  Our role is that of a
due process safeguard, ensuring only the rationality of the trier of fact’s
finding of the essential elements of the offense beyond a reasonable
doubt.  See Moreno v. State, 755 S.W.2d 866, 867 (Tex.
Crim. App. 1988).  We give deference to
the responsibility of the fact finder to fairly resolve conflicts in testimony,
to weigh evidence, and to draw reasonable inferences from the facts.  Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  However, our duty requires us to “ensure that
the evidence presented actually supports a conclusion that the defendant
committed” the criminal offense of which he is accused.  Id. 

We now review the factual
sufficiency of the evidence under the same appellate standard of review as that
for legal sufficiency.  Ervin v. State, No. 01-10-00054-CR, 2010 WL
4619329, at *2–4 (Tex. App.—Houston [1st Dist.] November 10, 2010, no pet.
h.).  

Sufficiency of the Evidence

          In
his first issue, appellant argues that the evidence is legally insufficient to
support his conviction because, although the State proved that he had a motive
to burn his SUV, “it did not offer any proof, even circumstantial, that [he]
set fire” to his SUV.  In his second issue,
appellant argues that the evidence is factually insufficient to support his
conviction because “a review and consideration of all the evidence certainly undermines
any contention that a rational trier of fact could find that [appellant]
intentionally or knowingly set fire” to his SUV.  

Here, appellant stood accused by
indictment of committing arson by starting a fire with the intent to destroy or
damage his SUV knowing that it was insured against damage or destruction or
knowing that it was subject to a security interest.  See
Tex. Penal Code Ann. § 28.02(a)(2)(B),(C)
(Vernon Supp. 2010).  The State had the burden of proving
beyond a reasonable doubt that the fire was set intentionally and appellant set
the fire or was criminally responsible for setting it.  See Orr v. State, 306 S.W.3d 380, 394
(Tex. App.—Fort Worth 2010, no pet.); see also Fitts v. State, 982 S.W.2d 175, 186 (Tex.
App.—Houston [1st Dist.] 1998, pet. ref’d). 
Evidence that establishes no more than motive and opportunity will not
suffice to prove the corpus delicti
of arson.  Fitts, 982 S.W.2d at 186.  However,
evidence tending to establish the corpus
delicti need not be direct, but may be circumstantial.  Penry v. State, 691 S.W.2d 636, 648 (Tex. Crim. App. 1985).

The State argues that the evidence
is legally sufficient to support appellant’s conviction because the
circumstantial evidence shows that appellant had a motive for committing the
offense and the State provided evidence on each element of the offense.  The State asserts that “[a]ttempts to conceal incriminating
evidence, inconsistent statements, and implausible explanations to the police
are probative of wrongful conduct and are also circumstances of guilt.”  See Guevara
v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2005).  During trial, the State did point out several
inconsistencies in the statements that appellant had made.  However, the inconsistencies have no relation
to the cause of the fire, appellant’s whereabouts at the time of the fire, or
anything about the burning of the SUV.  The
inconsistencies concern appellant’s acquisition of the SUV and, possibly, the
extraneous offense of identity theft.[2]  Although the inconsistencies in his
statements may be probative of his having committed the offense of identity
theft, appellant was on trial for the offense of arson, and the State had the
burden to prove each element of the offense beyond a reasonable doubt.  

The State did present evidence that
appellant had a motive to set fire to the SUV to obtain proceeds from an
insurance policy to pay off the loans and conceal his fraudulent activity in
obtaining the SUV.  The State asserts
that appellant’s motive constitutes circumstantial evidence that he actually committed
arson.  In support of this argument, the
State cites Orr.  In Orr,
the court found the evidence sufficient to show that the defendant had committed
the offense of arson where the defendant had a motive, was present at the time
of the fire, and gave implausible explanations about the fire.  306 S.W.3d at 395.  There, the defendant went to her neighbors’
house to notify them that her house was on fire.  Id.
at 397.  The neighbors called for
emergency assistance, and one of the neighbors remained with the
defendant.  Id.  The defendant, however,
informed authorities that she had attempted to re-enter her house in an attempt
to get to her wheelchair-confined husband. 
Id.  The neighbors’ testimony, along with the
testimony of the defendant’s daughter, made the defendant’s explanation
implausible because they testified that the defendant was with them the entire
time of the fire and had no opportunity to return to the house.  Id.  Furthermore, the defendant and her husband
had over $1 million in insurance, and, within hours of the fire, the defendant
had contacted an insurance company in an attempt to recover a portion of the proceeds.  Id.
at 395.  Yet, the defendant, months later,
told a fire investigator that she was unaware of the insurance policies,
despite the fact that she had already made claims on the policies.  Id.  Additionally, the defendant was pregnant by
another man, her husband had planned to move out within the next few days, and
there was evidence that her husband’s family financially supported the
defendant.  Id.  Accordingly, the court
concluded that the defendant not only had a motive to intentionally set fire to
her house, but the evidence was also sufficient to prove that she had committed
arson.  Id. at 396.  Here, in
contrast, the State failed to present any evidence other than that on the issue
of motive to establish that appellant set his SUV on fire.  

          Motive
is a relevant factor in determining whether a defendant has committed the
offense of arson; however motive, standing alone, does not constitute
sufficient evidence that the defendant did commit the offense.  Guevara,
152 S.W.3d at 50; Kresbach v. State,
962 S.W.2d 728, 734 (Tex. App.—Amarillo 1998, pet. ref’d).  The State cites several cases in which motive
was considered in determining whether the defendant had committed arson;
however, in each of these cases, evidence of motive was accompanied by other
circumstantial evidence indicative of guilt. 
See id. (motive, presence at
scene, and fabrication of stories about fire and discovery of fire); Orr, 306 S.W.3d at 395 (motive to commit
arson, presence at scene, incendiary origin of fire, and inconsistent
statements).  Furthermore, in cases where
motive was considered a factor evidencing a defendant’s connection to an arson,
other evidence was presented linking the defendant to the scene of the crime.  See
Buchanan v. State, No. 04-08-00871-CR, 2010 WL 307875,  at *4 (Tex. App.—San Antonio Jan. 27, 2010,
pet. ref’d) (mem. op.) (defendant’s motive, threats, angry behavior, incendiary
origin of fire, and presence before fire supported inference that defendant committed
arson); Calvin v. State, No.
04-03-00121, 2004 WL 2671651, at *2 (Tex. App.—San Antonio Nov. 24, 2004, pet.
ref’d) (mem. op.) (motive to commit arson combined with burns on defendant
sufficient to establish defendant’s identity as arsonist); Taylor v. State, 735 S.W.2d 930, 941 (Tex. App.—Houston [1st Dist.]
1987, no pet.) (motive to commit arson, incendiary origin, and presence at
scene sufficient to support conviction). 


          Here,
the State presented evidence that the fire was incendiary in nature, Cornell
opined that “trash” found in appellant’s garage would be commonly found in the
glove box of a car, Cornell found matches at the scene, and appellant was in
possession of both sets of keys to the SUV at the time that he stated it was
taken from outside Houston’s apartment.  On
appeal, appellant does not challenge the State’s evidence that the fire was
incendiary in nature.  Therefore, we
consider only whether the State presented evidence establishing appellant’s
identity as the person who started the fire. 

Cornell did find “several bags of what appeared to be trash”
in appellant’s garage.  In the bags,
Cornell found a Cartronix envelope, the SUV’s window sticker, receipts, an
envelope with David Ross’s name on it, a Crown Royal bag, a “couple bottles” of
Crown Royal, Sprite, a Discount Tire receipt, a Hallmark Oil and Lube Center
invoice, some dealer paperwork, and a Blockbuster video receipt.  The
State notes that bottles of alcohol were among the items found by Cornell and
appellant had been drinking the night that his SUV was burned.  However, the State presented no evidence that the
alcohol was consumed by appellant on the night of the fire.  Cornell opined that the various papers and
receipts would commonly be found in a person’s car.  Although it may be common for such items to
be kept in a car, it does not necessarily follow that appellant would have kept
the items in his SUV before disposing of them.  A jury is free to draw reasonable inferences based
on the evidence presented; however, the “trash” found in appellant’s garage
simply does not connect appellant to the scene of the arson, and it does not constitute
evidence that appellant set fire to his SUV. 
A reasonable inference that appellant committed arson cannot be drawn
from the fact that Cornell found various receipts, papers, and bottles of
alcohol in appellant’s garage.  

The State also asserts that among the items found in
appellant’s garage were some matches, which were admitted as State’s exhibit
26.  However, after a review of the record,
it is apparent that State’s exhibit 26, consists of the matches that Cornell found
at the scene of the burned SUV.  The
evidence bag is clearly marked as recovered on “December 17, 2006,” the day the
SUV was discovered burned, “location 4114 Brynmawr.”  These matches could not have been found in
appellant’s garage, as Cornell did not search appellant’s garage until over one
month later, when he was given permission to do so on January 24, 2007.  There is simply nothing in the record linking
these matches to appellant’s possession. 
This is further evidenced by Cornell’s testimony that if the matches at
the scene had been linked to a “person of interest” they would have constituted
“crucial” evidence.  However, no such
connection was made, and Cornell testified that he was unable to determine the
source of the ignition of the paper that started the fire.  

          The
State also presented evidence that appellant was in possession of both sets of
the keys to the SUV at the time that he said it was taken from outside
Houston’s apartment, and it could not have been started without a key.  However, appellant’s possession of the keys to
the SUV does not show that he was the person that set the SUV on fire.  The State notes that there is no evidence that
the SUV was towed to the location where it was found, implying that the SUV
must have been driven there.  Cornell did
testify that he did not see any “tire tracks,” “big truck tracks,” or anything
in front of or behind the SUV to indicate that a wrecker had towed the SUV to
the location.  However, an examination of
the photographs depicting the location where the SUV was recovered reveals that
it was found in a grass field, with no tire tracks in front of the SUV or
behind it.  While the State is correct
that there is no evidence that the car was towed to the location by a wrecker,
given that there is no evidence of any tire tracks at all, even from the SUV
itself, there is also no evidence that the car was not towed to the location by
a wrecker.  

Viewing the evidence in a light
most favorable to the prosecution, the evidence shows that appellant had a
motive to commit arson, appellant was in possession of both sets of the keys to
the SUV at the time that he stated it was taken, and appellant, at one point in
time, may have taken various receipts, papers, and other items out of his SUV.  We recognize that each fact need not point
directly and independently to the guilt of appellant.  However, the logical force of the probative
evidence, coupled with reasonable inferences, must be sufficient to support the
conviction.  Evans v. State, 202 S.W.3d 158, 166 (Tex. Crim. App. 2006).  Here, there is simply no evidence that
appellant was the person responsible for setting his SUV on fire.  Motive alone is not sufficient to prove arson,
and, motive coupled with appellant’s possession of the keys to the SUV does not
show, beyond a reasonable doubt, that appellant was the person responsible for
burning his SUV.  Unlike the cases in which
motive was a factor to be considered in reaching the conclusion that a suspect had
committed arson, here, appellant was not seen in the area shortly before or
after the fire, he was not present at the scene during the fire, and he was not
found in possession of any items linking him to the fire.  Our duty requires us
to “ensure that the evidence presented actually supports a conclusion that the
defendant committed” the criminal offense of which he is accused.  Williams, 235 S.W.3d at 750.  Although the
evidence shows that someone intentionally set fire to appellant’s SUV, the
evidence does not support a finding that appellant was the person who set the
fire.  Viewing the
evidence in the light most favorable to the prosecution, we conclude that a
rational trier of fact could not have found beyond a reasonable doubt that
appellant committed or was complicit in committing the offense of arson.  Accordingly, we hold that the evidence is legally
insufficient to support appellant’s conviction.

We sustain appellant’s first issue.

Conclusion

          Having
sustained appellant’s first issue, we need not address appellant’s remaining
issues.  We reverse the judgment of the
trial court and render a judgment of acquittal. 
  

 

 

                                                                   Terry
Jennings

                                                                   Justice


 

Panel
consists of Justices Jennings, Higley, and Brown.

Do
not publish.   Tex. R. App. P. 47.2(b).

 











[1]           See
Tex. Penal Code Ann. § 28.02
(Vernon Supp. 2010).   





[2]           See
Tex. Penal Code Ann. § 32.51
(Vernon Supp. 2010).