

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00353-CR

_____

MIGUEL HERNANDEZ, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1379618D

Before Sudderth, C.J.; Gabriel and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. INTRODUCTION

A jury convicted Appellant Miguel Hernandez of capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2). Appellant was sentenced to life without parole. *See* Tex. Code Crim. Proc. Ann. art. 37.071. In a single point, Appellant asserts that the trial court erred by including an erroneous definition of "insanity" in the jury charge. Because we conclude that the error is not reversible, we affirm.

### II. BACKGROUND

#### A. The Murder

On July 27, 2014, the Fort Worth Police Department (FWPD) received two phone calls—the first at 2:25 a.m. and the second at 2:26 a.m.—from the residence of Don Keaton (age 82) and James Bowling (age 56). Because the first call identified a burglary in progress and the second call was a hang-up indicating distress, several FWPD officers were dispatched to the residence.

When they arrived, the officers heard a cry for help, the sound of glass breaking in the back of the house, and someone jumping the backyard fence. Upon entering the house, one of the officers discovered Don and James lying on the floor covered in a black gel-like substance that was later discovered to be drain cleaner. Don had been badly beaten and his eyes were swollen shut. James was dead and covered in blood.[1]

---

[1]The chief deputy medical examiner determined that James had suffered blunt force trauma to his head and face and had a broken hyoid bone due to significant

2

One officer observed a white pickup truck with blood on the driver's side door parked in a field behind the house. The officer discovered Appellant inside of the truck, completely naked except for socks and covered in blood. Appellant had multiple lacerations on his arms, hands, forehead, and back, and he had a strong "skunk-type smell." The officer requested that Appellant step out of the truck and lie down on the ground, and Appellant complied with the requests. The officer placed Appellant in handcuffs, at which point Appellant began to act erratically, repeatedly stating that he was "working for the dark prince." Whenever a new person arrived at the scene, Appellant would try to crawl under his truck because he was worried that people were going to try to kill him.

Around this time, the Fort Worth Fire Department (FWFD) also arrived at James and Don's residence. The FWFD captain testified that when he observed James and Don lying on the ground he initially thought both men were dead until he heard Don start talking. The captain observed that both men were covered in coagulated blood and the black substance.

Before arriving at the house, the captain had noticed that another engine company from his fire station had also been dispatched just down the street on a separate call. The captain soon wondered if the calls were related, so he walked a few blocks to check on the other engine company. When the captain arrived, he

force to his neck. The chief deputy medical examiner concluded that James died from strangulation.

3

witnessed Appellant sitting on the ground handcuffed, naked, and covered in blood. The captain, who estimated that he had responded to thousands of calls involving intoxicated individuals, believed that Appellant was "under the influence of something" because he was wild-eyed and agitated.[2]

Appellant was transported to John Peter Smith Hospital (JPS).[3] He was tested for methamphetamines and the results came back negative. The nurse on staff when Appellant arrived stated at trial that "there was no drug found in his system," but on cross-examination, she acknowledged that JPS has a "threshold amount" that causes a test result to come back as negative if an amount is discovered that is below the threshold amount. On redirect examination, the nurse stated that she had no knowledge of what the threshold amount is for methamphetamine and whether there was an indication of any methamphetamine in Appellant's drug test results.

## B. The Legal Proceedings

Appellant was indicted and charged with intentionally causing the death of James in the course of committing or attempting to commit burglary of a habitation.

Before trial, Appellant filed a notice of insanity defense. Appellant also filed a pretrial motion in limine requesting that the trial court instruct the State not to

---

[2]On cross-examination, the captain clarified that "when I said [Appellant] was under the influence of something, I didn't just think possibly narcotics. I thought maybe something spiritually was going on with him too."

[3]Appellant had been treated at JPS for a methamphetamine overdose approximately one month earlier.

4

comment on or allude to "[a]ny and all mentions of alcohol use, drugs, drug paraphernalia, and/or drug use" because Appellant "anticipate[d] that the State [would] attempt to introduce evidence of instances of alcohol use, drugs, drug paraphernalia and/or drug use by [Appellant]." In arguing the motion, Appellant's trial counsel explained the "intertwined" nature of Appellant's defense of insanity and the State's theory of voluntary intoxication:

> [APPELLANT'S TRIAL COUNSEL]: Judge, and to further amplify what the State is presenting, in this case it's probably going to become clear for the Court that their -- their belief of intoxication or relevancy of intoxication is going to be intertwined very closely with our presentation of -- of insanity which we intend to -- to introduce.
>
> Ultimately, *there's going to be a question as to whether the conduct was -- was based upon insanity, true insanity or from the State's perspective whether intoxication played a role.* The ultimate question is going to be left with the Court, of course. But *it's going to be a theme throughout at least the guilt/innocence portion.*

[Emphasis added.]

At trial, Appellant objected under rule of evidence 403 to the introduction of certain evidence that he was on drugs at the time of the murder because Appellant's drug screening at JPS had come back negative for methamphetamines. The trial court overruled Appellant's objection.

A FWPD detective interviewed Appellant approximately ten hours after the attack. The interview was recorded, and the video was admitted into evidence and played for the jury. In accordance with the video, the detective testified that he

believed Appellant was on drugs when he murdered James because Appellant had admitted to ingesting methamphetamines 30 to 45 minutes before the attack:

> [APPELLANT'S TRIAL COUNSEL]: And your belief is that he ingested some kind of drug, some -- some kind of drug. Do we know what kind of drug he ingested?
>
> [DETECTIVE]: Yeah, he said he ingested methamphetamines.
>
> [APPELLANT'S TRIAL COUNSEL]: And he said that he finished smoking 25, 30 minutes?
>
> [DETECTIVE]: He said 30 to 45 minutes prior.

Appellant's expert, Dr. Matt Mendel, stated that he had met with Appellant four times for a total of approximately fourteen hours. Dr. Mendel testified that "there's no doubt that [Appellant] was -- was psychotic back at the time that I saw him in 2015 . . . [and] that he was psychotic at the time of the crime." In rebuttal, the State called its own expert, Dr. Randall Price, who testified that Appellant was in a psychotic state at the time of the offense but that it was caused by voluntary intoxication.

At the charge conference, the State requested submission of an instruction that an insanity defense cannot be supported by voluntary intoxication and Appellant's trial counsel objected:

> [PROSECUTOR]: . . . We want -- I think it's 8.04 related to voluntary intoxication and the fact that temporary insanity is not a defense if -- if the intoxication was voluntary.
>
> [APPELLANT'S TRIAL COUNSEL]: And we would object to -- to that, Judge.

6

. . . .

THE COURT: . . . I'll give you a chance maybe tomorrow to argue it a little bit more before I make my decision . . . And I'm going to go ahead and put in the instruction the State requested as well in both.

[APPELLANT'S TRIAL COUNSEL]: The intoxication discussion?

THE COURT: Yes. And your objection is noted.

[APPELLANT'S TRIAL COUNSEL]: I'll make another objection tomorrow.

The next day, Appellant's trial counsel returned to the objection, addressing it in greater detail:

[APPELLANT'S TRIAL COUNSEL]: Well, Judge, that leaves me time to talk about intoxication, make my -- make my objection known to the intoxication.

THE COURT: Okay. Go ahead.

[APPELLANT'S TRIAL COUNSEL]: Judge, as noted by the Defense filing a motion in limine regarding any discussion of drugs, in addition to 403 objections made by the Defense regarding any drugs or drug use --

THE COURT: I can't hear. Go ahead.

[APPELLANT'S TRIAL COUNSEL]: Regarding any drugs or drug use, the issue is, of course, as the Court is aware, the presence of a negative -- negative drug screen after the offense. And it's the Defense's position that because of that objected evidence, the State has presented no evidence impeaching the actual screen. All of the evidence presented by the State . . . , even the statements of my client, all of them are not disputing the underlying fact that there is a negative drug screen associated by [Appellant] at that time.

7

The offer -- the evidence offered has only -- has not been impeachment. There has not been a demonstrative showing by the State that the test itself, the negative screen itself was not valid. There was no indication that the machine wasn't working properly. No evidence at all other than the -- the -- the -- the questions answered by the prosecutor -- asked by the prosecutor which are not evidence.

And this suggestion, as -- as I -- as I objected to under 403, the suggestion by the prosecutor that this -- the jury would have to ignore a negative drug screen without any supplemental affirmative evidence either denying or impeaching the validity of that drug screen is not evidence. And they are not entitled to a charge of intoxication based on the simple inference of their -- of their question.

The questionings -- the questions that they presented or the evidence that they presented, none of it includes any objective evidence which we can then counteract. All they've said was, well, ignore it. And they're inviting the jury to ignore evidence on the very issue which we're entitled to rely on.

So, by -- by the Court keeping the intoxication language in, it -- it -- and in light of my 403 objections throughout the course of the guilt/innocence portion, it effectively undermines the intoxication defense without them having to affirmatively prove beyond a reasonable doubt the -- a portion of the -- of the defense that I'm relying -- relying upon.

So we're in a solid situation where they didn't have any proof, they didn't have any proof to undercut or undermine or discredit the results that were given. All -- all -- all it was -- was in -- innuendo and reasons why it could be not true, and that's not evidence. And I don't think they've met their burden of -- by beyond a reasonable doubt of disproving our -- our affirmative Defense.

. . . .

[APPELLANT'S TRIAL COUNSEL]: Just briefly, Your Honor.

In addition, the -- the State's toxicologist by inference, by my questioning, indicated that if someone were a habitual drug user, as the evidence has borne out to show, that it would be more likely that

8

somebody would retain more methamphetamine in their system, certainly if they took all of the methamphetamine that they could into their lungs a short time before the offense.

The Defense would point the Court to the *Routh* case in which there is a discussion -- I believe it is Court of Appeals -- got a CR number, 11-15-0036, that's the Chris Kyle case. And it's similar situation where the Court found that there has to be some evidence, and in that case they actually had someone who was consuming marijuana with the individual on trial and convicted at that time. There's got to be some connection other than just the allegation that maybe inherently the impartial or the independent drug test is -- is wrong.

But that's -- that's the Defense position, Your Honor. We would object to the language of intoxication in that charge.

The court overruled Appellant's objection.

The jury returned a guilty verdict for the offense of capital murder as charged in the indictment. At the sentencing proceeding, the jurors did not answer the special issue regarding whether Appellant was a continuing threat to society, so the trial court sentenced Appellant to life without parole.

## C. The Sole Point on Appeal

In his sole point, Appellant contends that the definition of "insanity" in the abstract portion of the jury charge was erroneous because it improperly limited its scope to insanity arising from involuntary intoxication. While Appellant acknowledges that voluntary intoxication cannot establish insanity as an affirmative defense, he maintains that the definition is incorrect because insanity is not limited to instances of involuntary intoxication. According to Appellant, by instructing the jurors that they could only find Appellant insane if he was involuntarily intoxicated,

9

the court prevented the jury from considering the entire scope of Appellant's insanity defense—i.e., he was not intoxicated at all and yet still suffering from a mental disease or defect such that he did not know that his conduct was wrong.

The State responds that there is no charge error because involuntary intoxication as causation is implicit within an insanity defense and because the allegedly erroneous definition of insanity applied only to the instructions concerning intoxication. Moreover, to the extent that the abstract portion of the charge improperly limited what could constitute insanity, the application potion of the jury charge placed no such limitation on Appellant's insanity defense. Thus, in the event that we conclude the instruction was erroneous, the State argues that Appellant cannot demonstrate harm.

## III. ERROR

### A. Applicable Law

#### 1. Jury-Charge Error

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). Thus, in reviewing a jury charge complaint, we first determine whether error occurred; if not, our analysis ends. *Id.*; *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).

#### 2. Insanity and Intoxication

"Texas law, like that of many American jurisdictions, excuses a defendant from criminal responsibility if he proves, by a preponderance of the evidence, the

affirmative defense of insanity." *Ruffin v. State*, 270 S.W.3d 586, 591–92 (Tex. Crim. App. 2008). Section 8.01 of the penal code allows the affirmative defense of insanity if "at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." Tex. Penal Code Ann. § 8.01(a). There is a general presumption of sanity, and the defendant bears the burden of proving his insanity at the time of the conduct charged. *Martinez v. State*, 867 S.W.2d 30, 33 (Tex. Crim. App. 1993).

Evidence of intoxication may be relied on to establish insanity, but only a specific type of intoxication will support that defense. "Voluntary intoxication is not a defense to crime." *Reyna v. State*, 11 S.W.3d 401, 402 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd, untimely filed); *see also* Tex. Penal Code Ann. § 8.04(a); *Torres v. State*, 585 S.W.2d 746, 749 (Tex. Crim. App. [Panel Op.] 1979); *Brown v. State*, 290 S.W.3d 247, 250 (Tex. App.—Fort Worth 2009, pet. ref'd). Only intoxication that is involuntary is a defense to criminal conduct. *Torres*, 585 S.W.2d at 749.

Involuntary intoxication is an alternate means to prove insanity, or as one of our sister courts put it, "the insanity defense *also encompasses* the defense of insanity due to involuntary intoxication." *Haley v. State*, No. 10-13-00264-CR, 2014 WL 3556629, at *1 (Tex. App.—Waco July 3, 2014, pet. ref'd) (mem. op., not designated for publication) (emphasis added). Therefore, "the test used for insanity is . . . applicable to involuntary intoxication" and requires a showing that "as a result of his intoxication the accused did not know that his conduct was wrong or was incapable of conforming

11

his conduct to the requirements of the law he allegedly violated." *Torres*, 585 S.W.2d at 749.

## B.  Application of the Law to the Facts

The trial court worked to integrate the general principle of insanity and the subtleties of intoxication into the charge.  The relevant portion of the jury charge reads as follows, with the challenged portion italicized:

> You are instructed that no act done in a state of insanity can be punished as an offense.  It is an affirmative defense to prosecution of a criminal action that, at the time of the conduct charged against a person, as a result of severe mental disease or defect, he did not know that his conduct was wrong.
>
> The severe mental disease or defect must have existed at the very time or times inquired about, that is, at the very time of the alleged commission of the offense.
>
> The term "mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.
>
> You are instructed that voluntary intoxication does not constitute a defense to the commission of a crime.  You are further instructed that under our law neither voluntary intoxication nor temporary insanity of the mind caused by voluntary intoxication shall constitute any defense to the commission of a crime.
>
> By the term "intoxication" as used herein is meant disturbance of mental or physical capacity resulting from the introduction of any substance into the body.
>
> *By the term "insanity" as used herein is meant that as a result of involuntary intoxication the defendant did not know that his conduct was wrong.*
>
> The burden of proof is upon the defendant to prove this affirmative defense by a preponderance of the evidence.

12

By the term "preponderance of the evidence" is meant the greater weight and degree of the credible evidence in this case.

[Emphasis added.]

Here, the challenged definition in the abstract portion of the charge states that "the term 'insanity' as used herein is meant that *as a result of involuntary intoxication* the defendant did not know that his conduct was wrong." [Emphasis added.] Thus, Appellant plausibly reads the plain language of this definition as erroneously instructing the jurors that insanity, as used throughout the entire jury charge, can only arise out of involuntary intoxication. If this interpretation is correct, we agree with Appellant that the definition is erroneous because the penal code provides no such restriction that insanity may only arise from involuntary intoxication. *See* Tex. Penal Code Ann. § 8.01.

However, the State sets forth another plausible reading that, given the pattern throughout the jury charge of first stating a broad legal principle followed by pertinent definitions, the limited definition of insanity only applies to the two paragraphs of the jury charge immediately preceding it that address voluntary intoxication. That is, the erroneous insanity definition is contextual and clarifies what type of intoxication may establish the defense of insanity.

But although both readings are plausible, the definition itself states that it is to be used "herein." "Herein" is an inherently ambiguous term that could refer to the two paragraphs immediately preceding it (as the State contends) or the entire charge

13

(as Appellant contends). *See Herein*, Black's Law Dictionary (10th ed. 2014) (defining "herein" as meaning "[i]n this thing (such as a document, section, or paragraph)" and then stating that the term is "inherently ambiguous").

Therefore, because it is unclear whether the erroneous definition of insanity applies only to the two immediately preceding paragraphs or throughout the entire charge, we conclude that this portion of the charge is ambiguous and thus in error. *See Riley v. State*, 802 S.W.2d 909, 910–11 (Tex. App.—Fort Worth 1991) (op. on reh'g) (finding error when the court's charge is ambiguous), *aff'd*, 830 S.W.2d 584 (Tex. Crim. App. 1992).

## IV. PRESERVATION

Finding error in the jury charge is a necessary but not a sufficient condition for reversal. Before we can begin our harm analysis, we must first decide whether Appellant's objection during the charge conference preserved the error. Because Appellant's objection did not address or challenge the definition of insanity but only argued that the court should give no instruction on the issue of intoxication, we conclude that the error was not preserved, and we analyze the error accordingly under our unobjected-to standard.

### A. Applicable Law Regarding Preservation

While the case law is clear that we review jury-charge error whether objected to or not, the "possible consequences of error in the charge are . . . determined by whether timely objection was made in the trial court." *Bluitt v. State*, 137 S.W.3d 51,

14

53 (Tex. Crim. App. 2004). "In order to preserve error relating to the jury charge there must either be an objection or a requested charge." *Vasquez v. State*, 919 S.W.2d 433, 435 (Tex. Crim. App. 1996). "To preserve error with regard to a jury charge, objections must be sufficiently specific to point out the errors complained of." *Harkins v. State*, 268 S.W.3d 740, 746 (Tex. App.—Fort Worth 2008, pet. ref'd). "[T]he objection must be specific and clear enough to apprise the trial court of the nature of the objection—this specificity requirement is to enable the trial court 'to know in what respect the defendant regards the charge as defective and to afford him an opportunity to correct it before reading the charge to the jury.'" *Id.* at 747 (quoting *Pennington v. State*, 697 S.W.2d 387, 390 (Tex. Crim. App. 1985)).

**B. Analysis**

As quoted above, Appellant's trial counsel objected to the State's request for an instruction concerning voluntary intoxication. The objection was essentially that the State was not entitled to such an instruction because it had failed to put on evidence to support that Appellant was intoxicated on the night of the attack. However, Appellant has not directed us to (and we have not located) an objection to the wording of the charge as improperly limiting insanity to a condition induced by involuntary intoxication, or that Appellant's trial counsel even objected to the definition of insanity.

Therefore, because we conclude that Appellant's trial counsel's objection was not specific enough to alert the trial judge to the complaint Appellant makes on

15

appeal, we analyze the harm caused by the erroneous definition under our review of unobjected-to error. *See id.* (reviewing jury-charge error under standard for unobjected-to error because the defendant's objection "never [specifically] apprised the trial court of her complaint with regard to the article distinction, i.e., the use of 'a' rather than 'the,' but rather, complained broadly with regard to Paragraph IV in its entirety and its presence in the charge at all").

## V. HARM

### A. Applicable Law Regarding Egregious Harm

Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19. The appropriate inquiry for egregious harm is fact- and case-specific. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

In making an egregious-harm determination, we must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas*, 398 S.W.3d at 708–10 (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the

16

defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

Generally, when the application paragraph correctly instructs the jury, an error in the abstract instruction is not reversible. *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (op. on reh'g); *Bazanes v. State*, 310 S.W.3d 32, 39 (Tex. App.—Fort Worth 2010, pet. ref'd). Reversible error occurs in an abstract instruction only when the instruction is an incorrect or misleading statement of law that the jury must rely on to implement the application paragraph's commands. *Plata v. State*, 926 S.W.2d 300, 302 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997); *see also Arteaga v. State*, 521 S.W.3d 329, 338–40 (Tex. Crim. App. 2017) (holding that trial court reversibly erred by providing an incorrect definition of "prohibited from marrying" in sexual assault jury charge); *Riley*, 830 S.W.2d at 586–87 (holding that the confusing conflict between the abstract and application paragraphs on the burden of proof concerning insanity was reversible error).

**B. Application of the Harm Factors to the Trial Record**

**1. Jury Charge as a Whole**

Our review of the jury charge as a whole does not favor a showing of egregious harm. In addition to the erroneous definition of insanity, the abstract part of the charge also included an instruction that

> no act done in a state of insanity can be punished as an offense. It is an affirmative defense to prosecution of a criminal action that, at the time of the conduct charged against the person, as a result of severe mental disease or defect, he did not know that his conduct was wrong.

This provided the jury with the proper definition of insanity without limiting its application to involuntary intoxication. Therefore, the abstract portion of the jury charge contained both the full definition of insanity and the ambiguous version.

The application portion of the jury charge also included the correct, full definition of insanity in language that did not reference any type of intoxication or use of the word insanity but specifically required the finding of a severe mental defect or disease—i.e., the very conditions referenced in the correct definition in the abstract portion of the charge:

> Now, if you believe from the evidence beyond a reasonable doubt that on or about the 27th day of July 2014, in Tarrant County, Texas, the defendant, Miguel Hernandez, did then and there intentionally cause the death of an individual, James Bowling, by strangling him with his hands or with his arm, and the said defendant was then and there in the course of committing or attempting to commit the offense of burglary of a habitation of James Bowling, who was the owner of said habitation as alleged in the indictment, *but you further believe, by a preponderance of the evidence in the case, that at the time he committed the act, if he did, the defendant, as a result of a severe mental disease or defect, did not know that his conduct was wrong,*

18

then you will find the defendant "Not Guilty by Reason of Insanity," and so state in your verdict.

[Emphasis added.]

Therefore, because the abstract part of the charge also contained a correct definition of insanity and because the application portion of the charge did not contain or rely upon the ambiguous insanity definition, the jury charge as a whole does not support a finding of egregious harm. *See Plata*, 926 S.W.2d at 302.

## 2. Arguments of Counsel

The State's theory of the case was that Appellant voluntarily got high on methamphetamines and then murdered James. The defense contended that Appellant's mental state did not result from his consumption of drugs.

Beginning in voir dire, the State repeatedly apprised the jury that while involuntary intoxication may cause temporary insanity and be a defense to a crime, voluntary intoxication will not support an insanity defense. As explained above, the State is entitled to an instruction—and thus may argue—that voluntary intoxication cannot be the basis of an insanity defense when an appellant asserts the defense of insanity and there is evidence, even "slight," that a mental defect could have been caused by the defendant's drug use. *See* Tex. Penal Code Ann. § 8.04(a); *Taylor v. State*, 885 S.W.2d 154, 158 (Tex. Crim. App. 1994). Moreover, during voir dire, the State repeatedly provided the correct definition of insanity without reference to intoxication.

19

The prosecutor's closing argument conformed mostly to the charge's proper definition and application of insanity but made a passing reference that arguably repeated the ambiguity noted in the charge. Initially, the prosecutor provided the correct definition of insanity and then stated, again correctly, that voluntary intoxication is not a defense to a crime.

The last two sentences that we highlight in the quotation below pose the slight suggestion of the same ambiguity found in the charge. However, these sentences specifically reference the words "temporary insanity," and the only place those words occur is in the portion of the charge dealing with the interrelation of intoxication and insanity. Thus, the argument does a better job of limiting the reach of the questionable instruction than does the charge itself:

> There's one other issue I want to talk with you about before I sit down. And you already know what it is. It's the law of insanity. *And the Court tells you in its instruction what insanity means*, and you know what it means because we talked about it in jury selection. You've heard us talk about it during the course of this trial. And you know that insanity is when a person suffers from a severe mental disease or defect that causes [the person] not to know the difference between right or wrong.
>
> But you also know from the Court's Charge that voluntary intoxication is not a defense to crime. And *the Court goes on to tell you that in order for someone to be temporarily insane, it can't be from voluntary -- from voluntary intoxication. It has to be from involuntary intoxication.*

[Emphasis added.]

Immediately thereafter in his closing argument, Appellant's trial counsel reminded the jury of the requirements for insanity and in so doing appeared to

20

recognize that by that stage in the trial, the jurors should have known the proper definition of insanity:

> Now let's back that up a little bit and let's just think about this. *When we start talking about insanity, there's two parts to it. You know that.* One, that he was suffering from a mental disease, a severe mental disease and, two, that he didn't know right from wrong.

[Emphasis added.]

Therefore, notwithstanding the one isolated but potentially problematic snippet of the State's closing argument, when taken as a whole, the arguments of counsel do not support a showing of egregious harm because the correct definition of insanity was used throughout the trial and because the arguments did not compound the charge's error but arguably clarified the erroneous definition in the abstract portion of the charge. *See Gelinas*, 398 S.W.3d at 710 (concluding counsel's arguments did not show egregious harm because "correct jury arguments most likely alerted the jury to the error and allowed [it] to recognize the mistake and properly apply the law").

### 3. Entirety of Evidence

Our review of the entirety of the evidence does not support a finding of egregious harm. The evidence focused not on a distinction between voluntary and involuntary intoxication but on whether the voluntary ingestion of drugs or psychosis produced Appellant's behavior.

The jurors could have relied upon the testimony of the FWPD detective, FWFD captain, and Dr. Price to find that Appellant voluntarily ingested

21

methamphetamines 30 to 45 minutes prior to murdering James thereby precluding an insanity defense because Appellant's mental disease or defect was caused by voluntary intoxication. *See Sakil v. State*, 287 S.W.3d 23, 27 (Tex. Crim. App. 2009) (concluding that although the "evidence did not establish unequivocally that [the appellant] was intoxicated the day of the assault," testimony of the appellant's drug use from his psychiatrist was still "sufficient evidence from which a juror could conclude that intoxication somehow excused [the appellant's] actions").

Moreover, the jurors could have believed the testimony of Dr. Price that Appellant was voluntarily intoxicated and not believed the testimony of Appellant's expert, Dr. Mendel, that as a result of severe mental disease or defect, Appellant did not know that his conduct was wrong at the time of the attack. *See Fitts v. State*, 982 S.W.2d 175, 186 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) ("The jurors are to determine the appropriate weight to accord expert testimony, and they may reject such testimony if it fails to comport with the jurors' concepts of sound logic.").

Therefore, the entirety of the evidence does not support a finding of egregious harm.

### 4. Conclusion Regarding Harm

Appellant claimed the defense of insanity and contended throughout trial that he was not intoxicated—be it voluntarily or involuntarily—at the time of the offense. However, in response the State contended throughout trial that Appellant was voluntarily intoxicated and thus could not prove an insanity defense. The State was

entitled to put on evidence of voluntary intoxication and have the issue submitted to the jury. *See Taylor*, 885 S.W.2d at 158. That is, while Appellant was entitled to raise insanity as an affirmative defense, the State was also entitled to rebut the defense, and it did so here through testimony that supported its theory that Appellant was high on methamphetamines when he committed the offense. The State was also entitled to an instruction explaining what type of intoxication could support the defense of insanity. *See id.*

Moreover, the erroneous definition is located in the abstract portion of the charge, and the court of criminal appeals has instructed that "[g]enerally, reversible error occurs in the giving of an abstract instruction only when the instruction is an incorrect or misleading statement of law that the jury must understand in order to implement the commands of the application paragraph." *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012). And although the definition of insanity in the abstract portion was ambiguous and thus, erroneous, the application paragraph did not require that the jurors understand the erroneous definition of insanity in order to implement the commands of the application paragraph. *See id.* at 467. That is, the application paragraph did not rely on the abstract portion's definition of insanity but instead included the statutory definition of insanity, instructing the jurors if "you further believe, by a preponderance of the evidence in this case, that at the time he committed the act, if he did, [Appellant], as a result of a severe mental disease or defect, did not know that his conduct was wrong, then you will find [Appellant] 'Not

23

Guilty by Reason of Insanity,' and so state in your verdict." Finally, the ambiguity was not accentuated by the argument of counsel or the evidence.

Based on the foregoing analysis of the egregious-harm factors, we conclude that the error in the abstract portion of the jury charge did not cause Appellant egregious harm and is thus not reversible. Accordingly, we overrule Appellant's sole point.

## VI. CONCLUSION

Having overruled Appellant's sole point, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 7, 2019